1817.

SKINNER
v.
DAYTON.

*SKINNER *against* DAYTON and others.

A Court of equity gives relief against a *penalty* or *forfeiture*, where the case admits of certain compensation; but not where the sums covenanted to be paid are in the nature of stipulated damages; but it will not interfere, unless the party can be clearly and fully indemnified, and placed in the same situation as if nothing had happened.

By an agreement, made in *April*, 1815, *A.* covenanted with *B.* and *C.* (directors and agents of a manufacturing company) to make certain machinery, in one year, at a certain price, to be paid in instalments; on the 1st of *August* following, *B.* and *C.* gave notice that the company could not go on, and that the contract was abandoned; and *A.* (the covenants being independent) brought an action at law against *B.* and *C.*, to recover the instalments due before the 1st of *August.* The Court refused to stay the suit at law, by injunction, until the amount of *compensation* justly due to *A.*, for the work he had done, could be ascertained by a master, or by an issue of *quantum damnificatus*; the plaintiff's right of action at law being clear and certain, and the amount of the instalments sued for appearing, from the answer of *A.*, not to exceed an adequate compensation for the materials found, and work done by him towards the fulfilment of his contract, on the 1st of *August.*

It seems, that one party alone cannot rescind a contract; and if *A.* had gone on, notwithstanding the notice from *B.* and *C.*, and completed the machinery, according to his contract, and tendered it to them, whether he would not be entitled to demand the full sum stipulated to be paid? *Quære.*

THE bill stated that the plaintiff, and *Abraham Dayton*    *August* 28th.
*Reuben Wheeler, William Raymond, jun., Nathan H. Raymond, Abner S. Hitchcock,* and *Nathan Dean,* defendants, and *Ira Hall,* on the 10th of *April,* 1815, formed an association, in writing, called *The Granville Cotton Manufacturing Company,* with a president, and from two to four directors; and that it was agreed, among other things, to be the duty of the president and directors, to appoint a *general agent,* to purchase stock and vend goods, and, under the direction of the president and directors, to do business; and that each person, at the time of subscribing, was to pay, on each share, 10 dollars, and, from time to time, such assessments as the president and directors should make, or forfeit his shares, &c. The stock was to *be divided into 20 shares, which    [ * 527 ]
were taken by the plaintiff and the defendants above named, and by *J. White, R. Taylor,* and *M. White,* also defendants, who took two shares. The plaintiff was elected president, and two of the defendants, *W. R.* and *A. H.,* directors, and *N. R.,* treasurer.

On the 25th of *April,* 1815, an agreement was entered into between *White, Taylor & White,* and the plaintiff, as
407

agent and director, and with the approbation of the company, under the hands and seals of the parties, as follows: *W., T. & W.*, promise to make, and deliver at the factory, of the best materials and workmanship, 12 throssel frames, &c., (describing them,) to wit: six frames in the month of *October*, then next, and the six other frames on or before the 1st of *May*, 1816; and the plaintiff and *W. R.* and *A. H.*, as directors, engage in behalf of the company, to pay *W., T. & W.* 15 dollars for each spindle, or 15,120 dollars, as follows, viz.: 900 dollars in 35 days, and 500 dollars in every 30 days thereafter, until all the machinery is in full operation, at which time the balance due *W., T. & W.* shall be paid.

The bill stated, also, that the constitution of the association was made known to *W., T. & W.* before the execution of this agreement, end that they had agreed to become subscribers for two shares, on being so employed, but annexed a further condition, that they should be exempted from any assessment which had been, or should be made, until the machinery was furnished and the factory in operation, which was agreed to by the plaintiff; and that this offer to be stockholders was the inducement to the plaintiff to enter into the above agreement.

The directors had raised, by assessments, about 1,100 dollars, to pay for land purchased; and on the 27th of *April*, 1815, they laid another assessment, on 18 shares, of 50 dollars each; *A. D., J. H.*, and *R. W.*, paid their assessments, amounting to 350 dollars, but all the other *stockholders refused to pay the assessments, and forfeited their shares, and all previous payments. The president and directors gave written *notice* to *White, Taylor & White*, that by reason of those forfeitures, the company could not go on, and the contract with *W., T. & W.* could not be performed. *N. R.*, who delivered the notice, was answered, that they had made no contract for machinery, but had done something towards the frames.

The bill further stated, that the plaintiff had been sued by *Clarke* and *Savage*, for stone for the building, which suit was still pending; that the sums raised by assessments amounted to 1,535 dollars; and 1,100 dollars was paid for land, 300 dollars for stone, and 110 dollars for mason work; and the plaintiff had paid out of his own funds 217 dollars and 94 cents. That *W., T. & W.* had not performed any part of their contract, and were insolvent. That *T.* had absconded. That one of the other partners was imprisoned for debt, and their partnership was dissolved. That in *August*, 1815, *W., T. & W.* brought an action, at law, against the plaintiff, for a breach of covenant contained in the above agreement; and

[ * 528 ]

408

averred, in their declaration, the non-payment of the 900 dollars, which was payable in 35 days, the sum of 500 dollars, payable on the 29th of *June*, and 500 dollars, payable on the 29th of *July*, 1815. That the plaintiff pleaded to this action, that before the agreement, the defendants and *Hall*, and *W., T. & W.*, entered into the association aforesaid, and appointed *W. R. & A. H.* directors and agents, and that the plaintiff executed the agreement as *director and agent*, and in no other capacity; to which plea there was a demurrer, on which the Supreme Court gave judgment against the plaintiff, in *August*, 1816.† That on the 25th of *August*, 1815, the plaintiff gave notice to all the other partners of the pendency of that suit, but they did not interfere in defence of it, though the company were under equitable obligation to bear an equal proportion of the loss. That *Ira Hall* died intestate, on the 18th of *September*, 1816.

*The bill prayed that the defendants might be decreed to pay to the plaintiff 217 dollars and 94 cents, and such other sums as he was obliged to pay, and that the agreement with *W., T. & W.* might be delivered up to be cancelled; and that an injunction should be issued to stay the suit at law, which was accordingly issued.

*Marvin White*, in his *answer*, admitted the articles of association of the 10th of *April*, 1815, &c.; and stated that he,——— *Taylor*, and *John White*, were partners, at *Troy*, in the business of making machinery for cotton manufactories. That on the 25th of *April*, 1815, in behalf of *W., T. & W.*, he executed the agreement above mentioned, with the plaintiff, and subscribed two shares to the company; but on the express condition that they, *W., T. & W.* should be exempt from any assessment which had, or should be made, until the factory was in operation. He denied that he agreed or expected to look to the members of the association for the performance of the agreement, but relied wholly on the liability and responsibility of the plaintiff. That in *May*, 1815, *N. H. R.* delivered him a letter from the plaintiff and the two directors, stating that several of the shares had become forfeited, and that the remaining stockholders would be obliged to abandon the business, unless some alteration was made in the contract; and that *Raymond* was authorized to agree to such alteration; but the defendant denied that the letter contained any notice that the company would not go on, or that the contract made by the plaintiff would not be performed. The defendant also denied that he told *R.* that they, *W., T. & W.*, had made no contracts for machinery, &c., but, on the contrary, he informed him, that they had provided materials for the machinery, and had contracted

1817.

Skinner
v.
Dayton.

†13 *Johns. Rep.* 307.

[ *529 ]

1817.

SKINNER
v.
DAYTON.

[ *530 ]

with a large number of workmen, by the year, to work on the machinery. That no proposals as to alterations were afterwards made by the plaintiff or others. That immediately after the contract, the defendant commenced the work on the machinery, and *continued the work until the first of *August*, when he received a letter from the plaintiff, dated the 24th of *July*, that convinced him that the plaintiff did not mean to perform the contract, which letter was the first notice *W.*, *T.* & *W.* had, of the intention of the company not to go on with the manufactory, and which he considered as amounting to a notice of an abandonment of the contract by the plaintiff, and a refusal to perform it. That the wages of the workmen employed on the machinery to that time, amounted to 2,377 dollars and 34 cents; and the cost of the materials purchased, to 882 dollars, 66 cents. That when the letter was received, on the first of *August*, *W.*, *T.* & *W.* were in good credit and solvent, and could have executed the contract, if the plaintiff had performed on his part; and that their subsequent insolvency was produced by the losses sustained in consequence of the failure of the plaintiff to perform his part of the contract. That the work and materials furnished, at the expense of 3,300 dollars, had become useless, and were not now worth 400 dollars, &c.

The answer of *John White* was, in substance, the same as that of *M. W.*

*August* 25th.

Buel, for the defendants, (*White, Taylor* & *White*,) now moved to dissolve the injunction staying the suit at law; and, also, that the costs of preparing the suit for trial at the last *October* circuit should be paid out of the money deposited by the plaintiff with the register.

He contended, that *W.*, *T.* & *W.* were not bound to contribute, as they took the two shares on special terms. That they were entitled to their actual expenditures and losses, in consequence of the contract, which amounted to 3,260 dollars; and they made no unconscientious use of their action at law on the covenant, since they assigned breaches only to 1,900 dollars, or for the three first instalments, which were due and payable when they received notice of the abandonment of the contract from the plaintiff. That the *Supreme Court (13 Johns. Rep. 312.) had decided that the plaintiff was bound by the covenant in his individual capacity; and the plaintiff was responsible, whether his assumed agency was founded in fraud or mistake, (1 *Fonbl. Eq.* 292, 293. s. 17. Id. 296. n. *b.* 295. s. 18. 3 *Johns. Rep.* 591.) That the plaintiff, having prevented the performance of the contract, cannot set up the non-performance as a defence. (*Roll. Abr.* pl. 5. *Doug.* 634. 1 *Term Rep.* 410

[ *531 ]

645.  1 *Fonb. Equ.* 391. and *notes.*)   That as the insolvency
of the defendants was caused by the failure of the plaintiff
to perform his part of the contract, he cannot make that an
excuse for the non-performance of his covenant.   [10 *Johns.
Rep.* 203.  1 *Fonbl.* 294. n. (*f.*)]  The plaintiff could not,
by his *notice,* stop the defendants from proceeding in the
work.   One party cannot rescind a contract.   But there was
no notice until the 24th of *July,* when the contract had been
performed by the defendants, to an amount exceeding the
sum demanded in the suit at law.   Hardship is no ground
for rescinding a contract.  (2 *Com. Dig.* ch. 4. D. 10.   2 *Vern.*
243.  1 *Ch. Cases,* 84.  *Newland on Cont.* 357.  1 *Fonbl.* 126.
n. *b.*  *Reeve's Domest. Rel.* 401.)   There was no sufficient
notice of abandonment of the contract until that of the
24th of *July ;* and if the business of the company had suc-
ceeded and been profitable, the defendants would have been
made responsible, notwithstanding the pretended notice in
*May.*

Again ; this Court will not rescind the contract, unless the
parties can be placed in *statu quo.*  The defendants ought
to be assured of an adequate compensation, and that can
come only from the plaintiff.

*Henry,* contra, insisted, that *W., T. & W.* were, at the
time of the contract, parties to the association ; that it was
not very credible that they looked to the plaintiff alone, but
must have considered him as contracting, in his representative
capacity, and binding the company, as their *agent.  The
authority of the plaintiff to contract, *as agent,* is no where
explicitly denied in the answers, and the answers of co-de-
fendants are not evidence for each other, against the plain-
tiff.   The acts of the plaintiff were recognized and approved
by the other members of the company ; and this approba-
tion is equivalent to an original authority.   The defendants,
*W., T. & W.,* contracted in reference to the fund, and were
bound to contribute ratably.   It is true, that hardship alone
is not a sufficient ground for rescinding a contract ; but here
*W., T. & W.,* being *members* of the association, contracted
on the faith of the *fund,* and when that failed, they were en-
titled to no more than *compensation.*   On the principle con-
tended for by the defendants, they might go on and recover
of the plaintiff all the instalments mentioned in the contract.
The covenants, he admitted, were independent ; and the
whole case resolved itself into a question of *quantum damni-
ficatus,* which could be ascertained either by an issue directed
by the Court, or by a reference to a master.   But the form
of the action at law wholly excluded that question.   The

1817.

SKINNER
v.
DAYTON.

[ * 532 ]

1817.

SKINNER
v.
DAYTON.

question of *indemnity* is not to be decided on the mere answers of the defendants, and the bill ought to be retained, for the purpose of ascertaining and settling the *compensation* to which the defendants may be entitled.

THE CHANCELLOR. The defendants contracted with the plaintiff in his individual capacity. This is the legal interpretation of the contract, as declared by the Supreme Court; and the two answers of the two *Whites* are explicit as to their intention so to contract. There is no doubt that the covenant of the plaintiff to pay the three instalments, for which the action at law was commenced, is an independent covenant, and there is nothing appearing in the case to show that the plaintiff is not held at law to perform it. What then is the equity which is to control that suit? It may be said, that

[ *533 ]

*White, Taylor & White* were parties to *the association, and, as such, bound to contribute ratably to all losses and charges. But I do not view the case in that light. They agreed to take two shares of the company stock, at the time the covenant was entered into with the plaintiff, but it was *on the condition* that they were to be exempted from any assessment which had or should be made, until the machinery was furnished, and the manufactory in operation. The manufactory never went into operation, and, therefore, the case never occurred in which they were to be called on for any assessment, or, in other words, for any contribution; and, as the contract was made with the plaintiff personally, and upon such condition, I do not perceive that he has any equitable claim upon them for a deduction of any portion of *his loss* from their demand, under the covenant. The taking two shares of the stock ought not, under the circumstances of the case, to have any effect upon the contract. But it may be said, that the defendants *W., T. & W.,* were duly informed of the failure of the funds and object of the association, and that they are entitled only to a just indemnity for their services and expenses *at the time of the notice.* Before we consider this point, it must first be ascertained when such notice was given. The bill charges, that notice, to that effect, was given in *May;* but this is denied in the answer, and the nature of the information given in *May* is set forth. The notice given in *May* by *Raymond,* accompanied with the explanations stated in the answer, was not sufficient to discharge the defendants from the execution of the contract on their part. It wanted precision and certainty, and the conversation with *Raymond* left it altogether indefinite. The only notice on which the defendants could, upon any colorable grounds, stay the further performance of the contract, was the one received on the 1st of *August.*

412

Whether the plaintiff could, under any circumstances, without the assent of the opposite party, rescind or suspend *the contract, is a point I need not now discuss. It appears, that the contract was, in fact, suspended, from and after the 1st of *August*, by notice from the plaintiff, and acquiescence on the part of the defendants, in the future discontinuance of the work. The suit at law is only for the instalments *then due*, and I do not perceive any clear and decided equity against the recovery of those instalments. The defendants, in their answers, aver actual damages, in consequence of the part performance and subsequent interruption of the contract, far beyond the amount of the instalments sued for, and there is nothing in the case to contradict the averment. The defendants have a title at law to the moneys due on the 1st of *August*, and the failure of the contract did not arise from any default in them. It was the act of the plaintiff, and it does not appear, affirmatively, to be inequitable or unjust, that the defendants should recover the instalments sued for. A legal right ought not to be interrupted, without some certain equity set up against it. I should think there ought to be something more than conjecture, that the 1,900 dollars due at law, exceed an adequate compensation.

If *W., T. & W.* had disregarded the notice, and gone on, and completed the machinery, according to the covenant, I am not prepared to say they would not have been entitled to have tendered the result of their labor, and demanded the entire sum of 15,120 dollars. I am inclined to think it is not in the power of one party alone to rescind a contract. This seems, indeed, to be permitted under the *French* law; (*Pothier, Traité du Contrat de Louage*, § 440—443.) but the language of the *English* judges is different. (*Smith* v. *Field*, 5 *Term*, 402.) As the defendants discontinued their work after the receipt of the notice, they are entitled, in equity, to a just compensation for the services they had *previously* rendered, and the moneys expended, and the injuries sustained under the contract. It is urged, however, that the amount of the compensation *ought not to be taken from the answers, but ought to be accurately ascertained by a reference, or an issue of *quantum damnificatus*, as it may possibly fall *short* of the 1,900 dollars, which the defendants are seeking to recover at law. I have felt all the weight due to this consideration, but it appears to me not to be discreet to interfere with the clear, certain claim of the defendants at law, in pursuit of a point of such uncertainty and speculation.

It is, no doubt, a general principle of the Court, that equity will relieve where a penalty is forfeited, if the case admits of a certain compensation; and the true foundation of the

1817.

SKINNER
v.
DAYTON.

relief is, that when penalties are designed only to secure money or damages really incurred, if the party obtains his money or damages, he gets all that he expected or required. In the cases of *Sanders* v. *Pope,* and *Davis* v. *West,* (12 *Vesey,* 282. 475.) it was admitted, upon the strength of a series of authorities, that where covenants are broken, and there was no fraud, and the party capable of giving complete compensation, equity would relieve against a *forfeiture* for a breach of *other* covenants than those for non-payment of rent. It is still, however, in all the cases, a *forfeiture,* or *penalty,* which is in question. But the instalments in this case were not in the nature of penalties, and the exaction of them is not the exaction of a forfeiture. They were intended as *payments* for equivalent services rendered, and expenses incurred, *pari passu,* with the accruing instalments. They were not, by any means, equivalent to the progress of the work, for the machinery was to be completed in one year, and the instalments payable within that time, under the contract, did not amount to a moiety of the stipulated compensation. The bill does not charge any default in the defendants. That is not the ground of the bill. I have a right to presume that the defendants were engaged in the actual and faithful execution of the contract on their part, when they were arrested by *the notice. The answers declare, explicitly, that fact, and the presumption arising out of the terms of the contract itself, is, that the compensation justly due the defendants is, at least, commensurate with the instalments claimed.

If the suit at law was for instalments payable *after* the 1st of *August,* and when the defendants had discontinued their labor and services, the case would present another and different aspect. But I am here called upon to interrupt the assertion of a legal right, upon the mere possibility of an existing equity against a part of the claim; and I do not think, as the case stands, that such an interruption would be a fit and discreet exercise of jurisdiction. " There is no branch of the jurisdiction of this Court," says Lord *Eldon,* in *Sanders* v. *Pope,* " more delicate, than that which goes to restrain the exercise of a *legal right.* That jurisdiction rests only upon this principle ; that one party is taking advantage of a *forfeiture.*" But the present case is not one in which the forfeiture is exacted. The instalments are more in the nature of stipulated damages, and it is settled that equity will not relieve against them. (*Woodward* v. *Gyles,* 2 *Vern.* 119. *Rolf* v. *Peterson,* 6 *Bro. P. C.* 470.) In all the cases in which the Court does interfere with the legal right, it must appear clearly, that full compensation can be made so

[ * 536 ]

414

as to render the party perfectly secure and indemnified, and place him in the same situation as if the occurrence had not happened. This is the doctrine laid down in *Sanders* v. *Pope*, and it is there admitted that the interference of the Court depends on discretion. I am not very certain that the injury to the defendants by the failure of so great an undertaking, after it had been in a course of performance, is susceptible of clear and definite compensation. There may be consequential damages arising from the loss of other business, which this undertaking dismissed, not easy to be reduced to calculation ; and, as the defendants are not in the wrong, and have done nothing that did not arise from their legal rights ; and as I am inclined *to believe, from the contract itself, and from the answers, that their damages are, at least, equal to the instalments claimed, there is no sufficient ground on which I can interfere with their suit at law.

I am, accordingly, of opinion, that the motion to dissolve the injunction be granted, and that the costs and expenses incurred in preparing the suit of law for trial, in *October* last, be paid, after they shall have been duly taxed, out of the moneys deposited by the plaintiff with the register.

Rule accordingly.