## Case No. 7,406.

JOHNSON v. POTOMAC BLDG. ASS'N.

[14 Leg. Int. 393; 2 Quart. Law J. 347.]

Circuit Court, District of Columbia. 1857.

Before DUNLOP, Chief Judge, and MERRICK and MORSELL, Circuit Judges.

MERRICK, Circuit Judge. The complainant is a member of one of those voluntary associations, with the principles and modes of operation of which the public has long been familiar, under the denomination of "building associations," and brings his bill into this court against the trustees of the association to restrain the enforcement of the stipulations he has entered into with them in the usual conduct of the business of the association, and in furtherance of the objects for which he and all its members enter into the co-partnership, upon the ground that those stipulations are usurious, unconscionable, and oppressive. This case is understood to raise the question, presented by several of like character on the docket, of the lawfulness of the operations of this class of associations, and of a large number of kindred societies which are known as "benefit societies," and have as their ostensible object the accumulation of a fund for each of their members by the periodical contribution of small savings, which are made productive by being advanced in certain amounts to individual members in the form of composition sales of their interests. All these societies combine two leading features, viz. hoarding savings and making profits by compounding interest on savings, on substantially the same principles as savings banks and mutual insurance companies, by the following simple process: A number of persons enter into mutual agreement to subscribe and pay into a common fund by regular installments, say of one dollar per month for each share the member may take, until the fund shall have accumulated so as to divide two hundred dollars or any other given amount to each share, at which period the partnership is to cease, and the share of each member thus accumulated will be a fund for him to purchase a small freehold tenement, or to be applied to any other prudential use he may determine; and to secure punctuality, each member neglecting his monthly payments is subjected to a fine, say of ten cents upon every dollar he fails to pay at the regular monthly meetings. The period of distribution is hastened, and the common fund made productive by authorizing any member to make a composition sale of his interest in the ultimate distribution to the other members of the association. Thus, whenever there are funds enough in the treasury for the purchase of one or more shares at any regular meeting of the association, the member who bids the highest premium, or, in other words, agrees to take the lowest price, is paid the price so bid by him for his ultimate share. He remains, however, a member of the society until the close, paying thenceforth a double monthly instal-

ment on his shares, two dollars per month on each, instead of one dollar, and subject to all the regulations of the society, liable to attend its meetings, and to do any duties which might be devolved upon any other member, and liable to the regulated fines, in default of punctual payment of monthly contributions, or any other default under the rules. Whenever a sale of this kind is effected, it is manifest that, unless some arrangement is made, the society has no security that the member who has been advanced by this sale his ultimate share of profits, will continue to bear his proportion of the burden of mutual contribution; therefore a bond in the penalty of the ultimate value of the shares sold, and a deed of trust upon real estate is executed to the society, conditioned for his faithful payment of the monthly dues thereafter to accrue, and all fines and forfeitures which may, under the rules, be imposed on him for any defaults. There is in the bond and deed no stipulation for the return of the principal sum advanced to the member, nor is it at all in the power of the society to compel its return if he fulfil the conditions of the bond and deed of trust. Should the member fail to comply, the bond and deed of trust become forfeit, and the society may direct a sale of the property conveyed by the deed, to raise the amount of damages which are ascertained and liquidated by the deed of trust, and which are usually the return to the society of the advance paid upon the bid of the member, with interest thereon, all the monthly dues and fines which may be in arrear; and the member is then and thereby reinstated in the condition of a member who has had no advance, and has paid all his dues and fines, &c.

The facts in the present case conform to the general scheme I have mentioned. John Johnson is a member of the Potomac Building Association, consisting of one hundred and seventy-six members. On the 5th of May, 1851, he received from the society $260, bid on two shares, of the ultimate value of $400. In other words, he sold to the other members at 35 per cent. discount, and gave bond and deed of trust for the payment of double monthly dues thenceforth, or $4 per month, and for such fines and forfeitures as he might incur; and, falling in arrear for dues and fines in December, 1856, the trustees under the deed of trust advertised the property for sale, and he has filed his bill, charging that the stipulations he entered into were only a device to cover an usurious loan, and praying to be discharged from his contract on payment of the principal sum of $260, with interest from May 5, 1851, and to be released from the fines incurred by him as a member of the society, and to enjoin a sale of the property by the trustees. The answer denies that there was any corrupt intent or secret agreement to effect an usurious loan

under the forms of stipulations entered into by parties, and sets out the bond, deed of trust, articles of association, &c., and avers that the contract was bona fide entered into and made and intended to be what it appears on the face of the papers, and none other. In the present stage of the cause, the answer must be taken as true, that the contract between the parties was whatever it appears to be, and that there was no other and different agreement behind the ostensible arrangement. Were there other secret agreement to make an usurious loan, to which the stipulations here shown were but an outward covering, and it were so charged in the bill by proper averments, it would become necessary, before a final hearing, to send down a case to a jury to ascertain whether there be in fact a secret corrupt usurious agreement for a loan; for whatever form parties adopt to hide usury, if they have secretly made a corrupt loan, the law will drag away the veil and penetrate the motive. But I do not understand the bill to charge any different agreement from that disclosed by the answer, and the question before us is therefore not one of intention, but one of construction upon the face of the articles of association, bond, and deed of trust exhibited with the answer. As a question of construction, it seems to me, both upon principle and authority, that stipulations like those we are considering are not usurious. To constitute usury, there must be a loan of money, in which the principal sum is not hazarded, and is to be repaid at all events, with more than legal interest. There was a time in the history of the law when the taking of any interest for the use of money was an heinous offence; but "usury has long since lost that deep moral stain which was formerly attached to it, and is now generally considered only as an illegal or immoral act, because it is prohibited by law." Supreme court, in Lloyd v. Scott, 4 Pet. [29 U. S.] 224. With this high warrant for a lenient construction of a penal law, no court should pronounce a contract usurious in which any of the elements of the definition are wanting, or which is within the exemption of adjudicated cases, but, on the contrary, should seek to enforce the principle that every man has a right to make what contracts he pleases, if not restrained by some law, and that justice and equity require that such contracts should be executed if fairly made. The very point involved in the present case was decided in Silver v. Barnes, 6 Bing. N. C. 186. Tindal, C. J., says the question was whether the transaction was a loan of money, or a dealing with the partnership funds. If it was a loan, it was usurious. We think it was a dealing with the partnership funds, in which the defendant had an interest in common with the other members of the society, and that it was not a loan; the defendant was

interested in the money when it was advanced, and when it was repaid. The rules of the society are in effect a mere agreement by the partners that their joint contributions shall be advanced for the use of one or other, as occasion requires, and the transaction was not a borrowing by the maker of a note from the payees.

In a later case, Burbridge v. Cotton, 8 Eng. Law & Eq. 62, Sir J. Parker says: "The case of Silver v. Barnes [supra] was a direct authority, that an advance out of the funds of an association of this kind, made pursuant to its rules, to one of its members, having in common with other members, an interest in the fund out of which the advances were made, and in the money, to be repaid by him, was not a loan of money, but a dealing with the partnership funds, and was not usurious. He was not aware that the authority of that case had ever been doubted. It had been approved by Parker, Baron, in Cutbill v. Kingdom [1 Exch. 494], and he considered that a decision of a court of law on such a subject was binding in this court." To the same effect are the cases of Seagrave v. Pope, 15 Eng. Law & Eq. 480; Mosley v. Baker, 6 Hare, 87, and other cases. It has been supposed that the cases of Silver v. Barnes, Burbridge v. Cotton, and all others, rest the principles of their decision upon the late English statutes of 7 Wm. IV., and 7 & 8 Vict., and also a previous statute (Geo. IV.) for the regulation of certain joint stock associations. But this is a total mistake, as may be found by consulting Wordsworth on Joint Stock Companies, as well as the cases themselves. They do not profess to rest upon a statutory privilege, but upon common law principles. These statutes had their origin with the statute of 6 Geo. I. c. 18, passed in 1719, which was made to restrain the creation of associations with shares transferable at pleasure, which, after the introduction of the South Sea Bubble, were used as means for the wildest forms of stock gambling, and indulged to such a mad and ruinous extent as to require the check of legislative prohibition. When mutual benefit and aid societies, having funds accumulated from small monthly subscriptions, were adopted about the beginning of the present century, it was much doubted whether they did not all fall within the prohibitions of the stock-gambling statutes, the provisions of which are numerous and very complicated. To remove these doubts, and to reduce into a system the manner of conducting these and other joint-stock associations having legitimate and beneficial objects, and to give greater facilities for the management and enforcement of the rights of these companies, the statutes of Geo. IV., superceded by 7 Wm. IV. and 7 & 8 Vict., were passed. These statutes are in no sense enabling statutes, but are in the nature of restraining enactments, requiring certain formalities, not at common law necessary, to give vitality to the association coming within their purview, and subjecting them to a certain inquisitorial control by boards of justices, &c. But these statutes, although none of them in force in this district, may be invoked for one purpose, viz.: to show the sense of the people and parliament of Great Britain that associations of this sort are of most beneficial tendency; and, pruned of abuses to which some of them are liable, are of great utility to the public, especially to the poorer classes, by encouraging thrift and supplying them with advantageous agencies for the accumulation and management of the savings of their daily labor.

But, altogether outside of any decisions touching joint-stock associations, it is well settled that if profit be derived through a bona fide partnership, the dealing with money is not usurious. Gilpin v. Enderley, 5 Barn. & Ald. 954; Fereday v. Hordern, 1 Jac. 144. The reason running through all these cases is that the principal sum is in hazard by the liability of the partners for the debts of the concern to third persons; and the principle is not varied by the fact that, under the particular arrangements of the business, any loss is highly improbable. An inspection of the scheme in this case will make apparent to any one, without pausing to illustrate it, that each member is interested in every dollar belonging to the concern; the greater the profits, the less will be the amount of his weekly contribution to raise the common fund to the distributive amount; and, if no profit is made, he will contribute all that he ultimately withdraws, and will only derive the benefit, a substantial one indeed, of the saving process. On the other hand, in payment of officer's salaries, rent, and other expenses, he is liable individually for all the debts of the concern, and therefore, to all legal intents and purposes, is a partner.

Independent of the partnership view of the case, as was argued at the bar, the contract may be likened to the purchase by the society from its member of an annuity. For the amount advanced or paid to him he agrees to pay double the monthly instalment on the shares represented during the life of the association. The duration of the society is altogether uncertain. It may, and probably will, expire before the monthly payments amount in the aggregate to the price he receives with simple interest, or it may continue until these exceed that amount. The purchase and sale of annuities and rent charges differ from a loan at interest in this: that, in case of a loan, the principal sum, as such, is to be repaid at all events. In the case of annuities and rent charges, redeemable, it may be repaid at the will of the purchaser; nor does it make any difference that the annuity is dependent upon a contingency other than the duration of a human life. Both in annuities and rent charges purchased, the stated payments may amount

to much more than the interest upon the price paid, and be so great as in all human probability, before the termination of the annuity, largely to exceed both principal and interest; yet the validity of the purchase is not thereby affected. The case of Lloyd v. Scott, decided in 4 Pet. [29 U. S.] 224, and afterwards tried in this court upon procedendo [Case No. 8,434], on an issue of usury before the jury, was the purchase of an annuity or rent charge, very like in its practical results to the present case; and in that case the court held that the covenant that a party might repurchase within a given period at the same price, and upon repayment of that price, with all arrears of instalments of the annuity which was equivalent to 10 per cent. per annum, to be entitled to re-conveyance of the premises charged, did not give the transaction in law the character of a loan, so as to taint it with usury, provided the original purchase was in good faith.

But it is further said that, although the sale of the shares upon a discount, coupled with an agreement to pay the double monthly instalments, may not be usurious, considered in the light of a partnership dealing, or an annuity sale, or a contract in which the principal sum is not, at all events, returnable, together with more than legal interest, yet the imposition of fines of ten cents for each dollar of monthly dues not punctually paid is usurious interest upon the monthly dues. This does not appear to me to be either a just construction of that part of the regulations of the society; nor if it were meant to be a reservation of interest, as interest, would it be usurious. The cases of Roberts v. Trenayne, Cro. Jac. 509, Floyer v. Edwards, Cowp. 113, and Wells v. Girling, 4 Moore, 78, 1 Brod. & B. 447, all deciding that, where the party may relieve himself from any interest at all by payment at a day certain, the reservation of more than legal interest in case of default is not usurious within the statute. But the fair construction of this part of the regulations of these societies seems to be that, inasmuch as punctuality and exactitude are essential to the just and profitable conduct of the business of the concern, the reservation of legal interest on non-payment of monthly dues being so inconsiderable, hard to compute, and next to impossible to collect and account for, it would be no compensation to the society for these defaults, nor any security against their frequent recurrence. Hence their rules fix as a measure of liquidated damages for each default, under the name of a fine, a certain small sum, in this and most other societies 10 cents on every dollar. The 16th rule of the articles in the case of Silver v. Barnes, already cited, calls these fines by the name of "liquidated damages."

Now, if the contract in this case was not usurious, was it an unconscionable and oppressive bargain, which a court of equity ought to relieve against? By reference to the tables of calculation which are published in the explanatory treatices on these subjects, or which, with a little trouble, may be calculated by any person for himself, it will appear that the average duration of these societies is from eight to nine years, dependent upon the range of premium which their advances command. A society with an average premium of thirty-five per cent., which the complainant in this case paid, will wind up in eight years and a fraction. What does an advance at thirty-five per cent. discount cost the member during eight years, as compared with the admitted standard of moderation,—a loan at six per cent.:

| | |
|---|---:|
| $400 at thirty-five per cent. discount is | $260 00 |
| Interest at six per cent. for 8 years is | 124 80 |
| | $384 80 |
| Double monthly dues for 8 years, at $2.00 per share | 384 00 |
| Balance in favor of an advance over an ordinary loan at six per cent. is | $ 0 80 |

Thus, it appears, in point of fact, that if the complainant were faithfully to comply with the terms of his contract, and to be in no default for monthly dues, instead of paying more than legal interest, he would get the advance and use of $260 for eighty cents less than simple interest, while the profit to the copartnership would be the active employment of his and other weekly dues in the interval.

Suppose the contract be terminated, and the complainant released from his connexion with the society, and he claims in his bill:

| | |
|---|---:|
| By payment of the advance | $260 00 |
| Legal interest thereon for five years and seven months | 87 10 |
| | $347 10 |
| Crediting the account with dues paid as per answer | 209 00 |
| Balance due to the society | $138 10 |

Suppose, on the other hand, the complainant be released upon the terms offered by respondents in their answer, the account will stand:

| | |
|---|---:|
| Debtor to amount advanced | $260 00 |
| To amount of fines, as per detail statement | 14 00 |
| Whole amount of dues prior to and after advance | 282 00 |
| | $556 00 |
| Crediting him by estimated value of his shares | 200 00 |
| By monthly dues already paid | 209 00 |
| | $409 00 |

The balance claimed by them is $147.00, or $8.90 more than by calculation of simple interest.

Suppose, on the other hand that the advance be restored to the society, and the complainant restored to the condition of a member having received no advance, which under

the terms of the articles of association is all that the society can insist upon without his consent to a dissolution of their relations, the account would be stated thus:

Debtor to advance.................... $260 00
To amount of fines incurred.......... 14 00
Total dues prior to and since his advance .......................... 282 00
                                      _____
                                      $556 00
And crediting the dues already paid in ........................ 209 00
                                      _____
Leaving an apparent balance of...... $347 00

But, to show the true attitude of the parties, it will be remembered that this balance of $347.00 represents within itself his remaining interest in the association, and the value of his ultimate distributive share. This share he may sell to any third person, or to the society, as they offer, by their answer, at its market value of $200, and the balance against him will be exactly as before, $147, or less than $9 above legal interest for the use of the advance for five years and upwards. Suppose the member resorts to the other alternative of voluntarily quitting the society after having enjoyed the benefit of his advance for five years and seven months. He has a right to do it without the assent of the association, as provided in their constitution, by returning the money advanced, with interest thereon, paying all fines incurred, and being credited with the dues already paid in. The account would then be:

Advance ......................... $260 00
Interest for five years and seven months  87 10
Fines incurred ..................... 14 00
                                      _____
                                      $361 10
Amount of dues paid in............. 209 00
                                      _____
Balance due association............. $152 10

—Or $14 more than simple interest for the use of the advance during five years and seven months.

No man who will give a thought to the subject can call a contract voluntarily entered into which presents these results unconscionable or oppressive.

But suppose that the forfeitures and fines imposed upon a defaulting member were much larger than those claimed in the present case. Would it be the province of this court, upon the bill of the defaulter, to relieve him from the consequences of his own contract and his voluntary acts? The distinction must always be remembered between calling upon a court of equity to relieve against a forfeiture or to enforce a forfeiture. In the latter case they may refuse to interfere. But the doctrine of relief has been restored from the confusion of the oldest decisions and narrowed to this: that unless the court can clearly see that full compensation can be made, and the forfeiture was not voluntarily and persistently incurred, it will not relieve, but let the party abide by the contract he has formed. In 2 Story, Eq. Jur. § 1323, it is thus summed up:

"The doctrine seems now to be asserted in England, that in all cases of forfeiture for breach of any covenant, other than a covenant to pay rent, no relief ought to be granted in equity, unless upon the ground of accident, mistake, fraud, or surprise, although the breach is capable of a just compensation." And in section 1325 he gives the special phase of reasoning which fits the present and like cases, viz.: "It is upon grounds somewhat similar, aided by considerations of public policy, and the necessity of a prompt performance in order to accomplish public or corporate objects, that courts of equity, in cases of non-compliance by stock-holders with the terms of payment of their instalments of stock at the times prescribed by which a forfeiture of their share is incurred under the by-laws of the institution, have refused to interfere by granting relief against such forfeiture." In the case of Sparks v. Liverpool Waterworks, 13 Ves. 433, which was a case of purely accidental forfeiture of stock in a corporation, under one of its by-laws requiring instalments to be paid at a certain time, the master of the rolls uses language precisely adapted to the business and objects of societies organized upon the principles we are considering. He says: "It is essential that the money should be paid, and that they should know their situation. Interest is not an adequate compensation even among individuals, much less in these undertakings. In particular cases interest might be a compensation, but in a majority of cases it is no compensation from the uncertainty in which they may be left. The effect is the same whether money has been paid or not. They know the consequence."

I agree with those enlightened judges and chancellors of England, Lord Eldon, and a host of others, who have always regretted that courts of equity had ever undertaken to relieve against forfeiture breaches of private contract. They have all admitted it to be "delicate and dangerous," and some have denounced it as "mischievous and arbitrary." See Eaton v. Lyon, 3 Ves. 693; cases of Sanders v. Pope, 12 Ves., at page 291; Hill v. Barclay, 16 Ves. 403, 18 Ves. 58; Bracebridge v. Buckley, 2 Price, 206; Rolfe v. Harris, Id., note page 210, and other cases cited in 2 Story, Eq. Jur. §§ 1320, 1325. For myself, I adopt the maxim laid down by Cranch, C. J., in Lloyd v. Scott [Case No. 8,434]: "Every man has a right to make what contracts he pleases, if not restrained by some law; and justice and equity require that such contract should be executed, if fairly made."

I am of opinion that upon the case made by the answer, the special injunction should be refused.

MORSELL, Circuit Judge, concurred in the foregoing opinion. DUNLOP, Chief Judge, dissented, and delivered a separate opinion.

DUNLOP, Chief Judge. A voluntary, unincorporated association, called the Potomac Building Association, was formed in Washington, in the year 1850, by the complainant Johnson and others. The constitution of the society provided that a monthly subscription of one dollar should be paid by the members in respect of each share held by them, until the joint contributions were of an amount to enable each member to receive two hundred dollars in respect of each share. Power was given to the society to advance to any member his shares at a discount, such member paying an additional dollar monthly on each share, as aforesaid, and executing a bond and deed of trust to defendants to secure the due payment of his future subscriptions. The complainant took an advance upon his two shares at a discount of thirty-five per cent. per share; that is to say, on his two shares, estimated as worth $400, $140 was deducted for discount, and he received in cash from the company $260, and executed to the defendants, the trustees of the building society, the bond and deed of trust set out in the proceedings in this cause for securing the payment of his future subscriptions. The deed of trust contained no covenant for the repayment of the advance. The complainant having failed to pay his monthly dues, &c., for more than sixty days, the defendants, as trustees, advertised to sell for the amount claimed by the building society in their account filed, which is in the following terms:

Jno. Johnson to Potomac Building Association.

### Dr.

| | | |
|---|---|---|
| 1851. May 5. To cash advanced on two shares of stock................ | $260 00 | |
| Monthly dues for two shares of stock for seven months, prior to taking advances, at $1 per share ............. | $ 14 00 | |
| Dues from May, 1851, to December, 1856, five years and seven months, at $2 per month each .............. | 268 00 | |
| | | 282 00 |
| Fines to December, 1856, as per statement in detail.................. | | 14 00 |
| | | $556 00 |

### Cr.

| | | |
|---|---|---|
| By amount of dues paid in, as per statement in detail herewith .................... | $209 00 | |
| By estimated value of his two shares of stock, by actual sales made December 1, 1856 .................... | 200 00 | |
| | | 409 00 |
| Balance due by Johnson.......... | | $147 00 |

Johnson, the complainant, filed his bill in this case, charging usury in the contract, and claiming to set it aside and to avoid the deed of trust on payment of principal and interest on the advance, and for an injunction to stay the sale by the trustees. The defendants, in their answer, deny usury, and assert their right to sell for the balance claimed by them in the foregoing account.

The complainant was a stockholder in the company to the amount of two shares, and had signed the constitution. The shares at the winding up were to be made worth $200 each. Johnson's shares $400, less $140, the premium bid by him for the advance, would be worth $260 at the winding up of the association, and to be accounted for to him in his settlement with the company at that value. The articles of the constitution of the building company which bear on this case, are as follows:

"Art. 2, § 3. Each and every stockholder, for each and every share of stock that they hold in this association, shall pay the sum of one dollar, in bankable funds, on the first Monday of each and every month, to the treasurer, or such other person or persons as shall from time to time, by the laws or regulations of the association, be authorized to receive the same, until the value of the whole stock shall be sufficient to divide to each share of stock the sum of two hundred dollars, at which time the association shall determine and close."

Article 8, "Advances," §§ 1, 2, 3, 7:

"Sec. 1. Every stockholder, for each share, entitled to purchase an advance of stock of $200, to be paid from the funds of the association," &c.

"Sec. 2. When the funds of the association warrant it, one or more advances shall be disposed of by the secretary to the highest bidder, at regular meetings of stockholders, not under par," &c.

"Sec. 3. Whenever a stockholder shall purchase an advance he shall pay, or cause to be deducted, the premium offered by him or them for the same, and shall secure the association by bond, deed of trust, and policy of insurance, the policy to be assigned to the trustees upon the trust for such amount as the board of directors may deem sufficient to cover the amount advanced, with all fines, costs, and charges which may accrue thereon."

"Sec. 7. Stockholders taking an advance from the funds of the association shall, from the time of purchasing such advance, pay to the treasurer two dollars per month for every share of stock on which such advance may have been made, (instead of one dollar, as hereinbefore provided, for those who have received no advance,) and if the same shall be suffered to remain unpaid more than two months, the board of directors may compel payment by ordering proceedings on the bond and deed of trust according to law."

This additional dollar per month on each share to a stockholder buying an advance is $12 per year, or six per cent., the legal rate of interest, valuing the share at $200, which is its computed value on the close of the concern. Johnson bought an advance on his two shares at thirty-five per cent. premium, received $260 in money, paid or had deducted $140 premium, gave his bond to the treasurer for $400, conditioned to pay

monthly dues of $2 per share on each share, and all fines. until the value of the whole stock shall be sufficient to divide to each share of stock $200; and also a deed of trust to Messrs. Ratcliffe and Clarke to secure these dues and fines, &c. The condition of the bond is worthy of special notice, and shows plainly the nature of the contract, and, together with the trusts of the deed, makes apparent the rights of the association and the duties and obligations of the borrower, and, as I construe them, are designed to carry into effect the true meaning of the constitution of the building company. The bond of date 15th May, 1851, is in the sum of $400. The condition of the bond is in these words: "Whereas, the said John Johnson, a stockholder to the extent of two shares in said association, has, by virtue of and in accordance with the provisions of the constitution and obligation attached thereto of the said association or joint-stock company, received advances from the funds of the said association, advances on said stock; now if the said John Johnson, or his heirs. executors and administrators, shall well and truly pay, or cause to be paid, unto the said Ephraim Wheeler, treasurer, as aforesaid, or to his successor in office. the sum of two dollars on each of the shares of stock on which he has received advances, as aforesaid, monthly, and every month, commencing with the first Monday in June, 1851, and continues to pay the same on the first Monday of each and every month thereafter, together with any fines and forfeitures for the nonpayment of said monthly dues, as is provided in said constitution and obligation, as aforesaid, until the funds of the said association shall divide to each share of stock the sum of two hundred dollars, then this obligation to be void, or else to remain in full force and virtue in law." And the deed of trust to Messrs. Ratcliffe and Clarke, of date the 2d of June, 1851, under which they now claim to sell complainant's house and lot, after reciting said bond and its condition, in substance, as above set forth, and that said deed was to secure said monthly dues, fines, and forfeitures. conveyed to them the property described in said deed upon the following trusts; that is to say: "If the said Johnson, his heirs, executors and administrators, shall fail to pay the said monthly payments, and the fines and forfeitures aforesaid. so that any one or more of the same shall be due and unpaid for the space of sixty days, then the said writing obligatory shall be deemed and taken as forfeited, and, upon request in writing, &c., the trustees shall sell, &c., and convey to the purchaser, &c.; and, out of the proceeds of the sale, pay first the costs and charges attending said sale; secondly, pay to the treasurer whatever sum or sums of money shall then be found due by the said John Johnson to the said association, on an account to be stated by the said treasurer; in which the said Johnson shall be charged with the sum of money received by him from the said association, and the monthly payments, fines, and forfeitures intended to be secured by these presents and the said writing obligatory, and credited with the amount of dues paid by him, and the residue. if any, pay over to the said Johnson, his heirs and assigns, &c. It is evident that the account here to be stated, and the whole terms of the bond and deed of trust, contemplate Johnson, to whom the advance has been made on the two shares, as still a partner, and to continue to be so till the final close of the association, when the two shares will be of the value of $200 each, and so to be estimated in the final settlement between him and his copartners, less the premium bid by him at the time of the advance; and it is on the assumption only that he is so to continue a partner that he can be made to pay dues up to the close of the concern, when each share is to be made of the value of $200. As such partner and contributor he is to share in the profits, present and to come, of the partnership.

The English cases referred to in the argument, clearing the transaction of usury, are based upon the assumption that the party to whom the advance is made is a partner at the time of the advance and when the advance is repaid, and so a sharer in the profits then and to the close of the concern. It can in no other sense be said to be a dealing in partnership effects by the partners inter se. In the case of Silver v. Barnes, 6 Bing. N. C. 180, Tindal, C. J., says: "A motion has been made for a new trial, on the ground of misdirection, but we think the case was properly left to the jury. The question was whether the transaction was a loan of money or a dealing with the partnership. If it was a loan it was usurious. We think it was a dealing with the partnership fund, in which the defendant had an interest in common with the other members of the society, and that it was not a loan. The defendant was interested in the fund when the money was advanced and when it was repaid. The rules of the society are. in effect, a mere agreement by partners that their joint contributions shall be advanced for the use of the one or the other, as occasion requires, and the transaction in question was not a borrowing by the maker of the note from the payees. In a case before Alexander, Chief Baron, in the year 1828, he held an advance, from a similar society to one of its members, to be a partnership transaction and not a loan." If the partner receiving the advance is turned out of the concern, and dispossessed of his profits by an arbitrary valuation of the two shares, as is claimed in the account presented in the defendant's answer, who value and take the shares to the use of the association at $100 each, when they are to be made worth $200 each, less the premium bid on them in

part by the complainant's monthly contributions to the end and winding up of the association, then he is no longer a dealer in partnership effects, having a common interest with his copartners in all profits to the close, but an outsider and a borrower of funds owned by strangers, and in that light the contract is clearly usurious. I refer to the case of Bechtold v. Brehm [26 Pa. St. 269], decided by the supreme court of Pennsylvania in 1856. The additional monthly payments of $12 a year on a computed $200 share, greatly exceed the legal rate of interest on the advance of $130 on that share, deducting $35 per cent. premium bid by the complainant and retained by the association when the advance was made. If the complainant is not a partner, and is subject to be ousted before the concern closes, he is not receiving his share by anticipation; he is not a sharer of profits present and to come. In that sense, by whatever name the transaction is called, it is a mere loan of money. It is a loan at a higher rate of interest than the law allows, for the forbearance; or giving day of payment, and the bond and deed, to secure the repayment of the principal, in which aspect the defendants treat said bond and deed in their account rendered, (as I think wrongfully,) being securities tainted with usury, are both void by the statute.

I entertain some doubt whether the contracts of this building association, as to advances, even when executed in good faith, according to the terms of their written constitution, are free from usury. Some of the English cases certainly go to that extent. The doubts there have been removed by statutory provisions which legalize these advances, and provide for the imposition of fines on members for failure to pay monthly dues within prescribed limits, the legislature of that country thinking such societies of beneficial tendency, and calculated to elevate the social condition of men having no other means than the fruits of their daily labor. Their expediency and utility is not so certain here, where any laboring man. with the high rate of wages prevailing in this country, can, with the exercise of ordinary prudence and carefulness, soon secure a homestead without involving himself in the expensive machinery of a building association, the articles of which are not easily understood by unlearned people, and very liable to be perverted to their oppression. These considerations, however, belong to the legislature and not to the courts of justice, and, if such associations are deemed beneficial they ought to be regulated and protected by statute, as has been done, it is believed, in some of our states. The fines which, by their constitution. the members agree to pay, in default of punctuality in the monthly dues, are in the nature of forfeitures, and are in fact sometimes so called by the society itself. If they were called liquidated damages their nature would not be changed. All the courts in this country, as I understand Kent. Story, and Marshall, both at law and in equity, are unwilling to enforce forfeitures, and lean against them. In England they have been sanctioned by the statutes to which I have referred. In the absence of any statute here, I think we ought only to enforce the payment of the dues by directing our auditor to allow interest on them from the periods when they accrued and fell due. As the trustees in this case claim to sell the complainant's property upon an account stated, and for a sum not warranted by law, nor even by the constitution of the building society itself, I think the injunction prayed ought to be granted, and to have effect till the cause is finally heard.

As to fines, penalties, and forfeitures, the following cases are in point: In Skinner v. Dayton, 2 Johns. Ch. 535, Kent, Ch., says: "It is no doubt a general principle of the court that equity will relieve where a penalty is forfeited, if the case admits of a certain compensation; and the true foundation of the relief is, that when penalties are designed only to secure money or damages really incurred, if the party obtains his money or damages he gets all that he expected or required." See, also, Livingston v. Tompkins, 4 Johns. Ch. 431.

"If the penalty is to secure the mere payment of money, courts of equity will relieve the party upon paying the principal and interest." 2 Story, Eq. Jur. § 1314. See, also, sections 1313, 1315. Section 1315: "The same doctrine has been applied by courts of equity to cases of leases, where a forfeiture of the estate and an entry for the forfeiture is stipulated for in the lease, in case of the nonpayment of the rent at regular days of payment; for the right of entry is deemed to be intended to be a mere security for the payment of the rent." And in note 2 to this section Story says: "In Hill v. Barclay, 18 Ves. 58, Lord Eldon, speaking of the relief given in cases of nonpayment of rent. said: 'It was upon a principle long acknowledged in this court, but wholly without foundation. Why without foundation? It proceeds upon the intelligible principle that the right of re-entry is intended as a mere security. It is so intended. There is the same ground of relief as in the case of a forfeiture by nonpayment of the money due upon a mortgage at the day appointed. No body doubts the justice and conscientiousness of interfering in the latter case. Why is it not equally proper in the former?'" Section 1316: "The true foundation of the relief in equity in all these cases is, that as the penalty is designed as a mere security, if the party obtains his money or his damages he gets all that he expected, and all that in justice he is entitled to; and, notwithstanding the objections which have been sometimes urged against it, this seems a sufficient foundation for the jurisdiction. In reason. in conscience. in natural equity there is no ground to say, because a man has

stipulated for a penalty in case of his omission to do a particular act, (the real object of the parties being the performance of the act,) that if he omits to do the act he shall suffer an enormous loss wholly disproportionate to the injury to the other party." (In this case a loss of ten per cent. a month, which I think oppressive.) "If it be said that it is his own folly to have made such a stipulation, it may equally well be said that the folly of one man cannot authorize gross oppression on the other side. And law, as a science, would be unworthy of the name if it did not to some extent provide the means of preventing the mischiefs of improvidence, rashness, blind confidence, and credulity on one side, and of skill, avarice, cunning, and a gross violation of the principles of morals and conscience on the other. There are many cases in which courts of equity interfere upon mixed grounds of this sort. There is no more intrinsic sanctity in stipulations by contract than in other solemn acts of parties, which are constantly interfered with by courts of equity upon the broad ground of public policy, or the pure principles of natural justice. Where a penalty or forfeiture is designed merely as a security to enforce the principal obligation, it is as much against conscience to allow any party to pervert it to a different and oppressive purpose as it would be to allow him to substitute another for the principal obligation. The whole system of equity jurisprudence proceeds upon the ground that a party having a legal right shall not be permitted to avail himself of it for the purpose of injustice, or fraud, or oppression, or harsh or vindictive injury." And in a note to the same section Judge Story says: "Lord Eldon has taken uncommon pains to express his dissatisfaction with the principle of allowing relief in equity against penalties and forfeitures, and also of the dispensation, with a punctilious performance of contracts by courts of equity. In Hill v. Barclay, 18 Ves. 59, 60, he used the following language: 'The original cases upon this subject are of different sorts. The court has very long held in a great variety of classes of cases that, in the instance of a covenant to pay a sum of money, the court so clearly sees or rather fancies the amount of damages arising from the nonpayment at the time stipulated that it takes upon itself to act, as if it was certain that, giving the money five years afterwards with interest, it gives a complete compensation. That doctrine has been recognized, without any doubt, upon leases with reference to nonpayment of rent upon conditions precedent as to acts to be done, payment of money, in cases of specific performance, and various other instances. But the court has certainly affected to justify that right, which it has assumed, to set aside the legal contracts of men, dispensing with the actual specific performance, upon the notion that it places them, as near as can be, in the same situation as if the contract had been with the ut-

most precision specifically performed. Yet the result of experience is, that where a man having contracted to sell his estate is placed in this situation, that he cannot know whether he is to receive the price when it ought to be paid, the very circumstance that the condition is not performed at the time stipulated may prove his ruin, notwithstanding all the court can offer as compensation.'" See, also, 16 Ves. 403, 405. "The whole argument of Lord Eldon is that courts of equity decree what they presume is compensation, but what in a given case may be no just compensation. Now, in the first place (says Story), this is no objection to an interference in all cases where a complete and adequate compensation can be given, but only to an interference where the facts establish that there cannot be such a complete and adequate compensation. And this is the very exception which, theoretically at least, courts of equity adopt. In the next place, it is supposed by Lord Eldon (Reynolds v. Pitt, 19 Ves. 140) that interest for the delay of payment of money is not or may not be an adequate compensation for the omission to pay at the time appointed. The objection equally applies to the allowance of interest at law as a compensation. It may in a given case be inadequate to the particular loss sustained by the creditor. Yet it is uniformly acted upon without hesitation, and the creditor will not be permitted to recover a greater compensation. The reason is that interest is a certain and general rule adapted to ordinary circumstances. And it would be inconvenient to go into a particular examination of all the circumstances of each case in order to ascertain the loss or injury. The general rule of interest is adopted because it meets the ordinary grievance and compensates for it. All general rules must work occasional mischiefs; besides, there would be an injustice in compelling a debtor to pay losses of a collateral nature not embraced in or connected with his own contract, over which he could have no control, and which might be imputed to the rashness or improvidence or want of skill of his creditor. No system of laws could provide for all the remote consequences of the nonperformance of any act. Human justice must stop, as it ought, at the direct and immediate and necessary consequences of acts and omissions, and not aim beyond a reasonable indemnification for them; at least the common law of England, equally with equity, has adopted this as the basis of its usual remedial justice."

Section 1326: "Where any penalty or forfeiture is imposed by statute upon the doing or omission of a certain act, there courts of equity will not interfere to mitigate the penalty or forfeiture if incurred, for it would be in contravention of the direct expression of the legislative will."

In the case of Sparks v. Liverpool Waterworks, 13 Ves. 428, the company was chartered by act of parliament, and it was enact-

ed: "That the property in and the profits of the undertaking were vested in the company in such shares and subject to such condition as had been or should be agreed upon." And by agreement the stockholders stipulated for forfeiture, &c. The statute, therefore, authorized the forfeitures. In Tayloe v. Sandiford, 7 Wheat. [20 U. S.] 13, Judge Marshall says: "In general a sum of money in gross, to be paid for the nonperformance of an agreement, is considered as a penalty, and not as liquidated damages; a fortiori, when it is expressly reserved as a penalty," not a set off. The cases of Mosley v. Baker, Burbridge v. Cotton, Cutbill v. Kingdom, and Seagrave v. Pope [supra], all arose under statutes legalizing fines. &c. Silver v. Barnes [6 Bing. N. C. 180] was decided in 1839, after the act of George IV.