Apgar's Case.

---

In matter of application of NANCY L. APGAR for the sale of lands limited over.

1. The statute under which these proceedings are had cannot be limited or controlled by the testator.

2. The statute deals with contingencies, not with presumptions, and consequently a married woman of the age of fifty-eight is within the provisions of the act.

3. Where the testimony shows a decline in value of the estate from the inability of the life tenant to make the necessary repairs to the lands and fences as well as to the buildings, a sale will be ordered if it appears that such sale will promote the interests of all.

On exceptions to master's report on petition for sale of lands.

*Messrs. Voorhees & Cotter*, for petitioner.

*Mr. R. S. Kuhl* and *Mr. Martin Wyckoff*, for exceptants.

BIRD, V. C.

The petition is filed to procure a sale of lands under the act which authorizes such sale when lands are limited over or in contingency, when such sale would be beneficial. It was filed July 28th, 1882. The land named in the petition was owned in fee by Paul Apgar, who died in 1856. In his will he said :

" I devise and bequeath unto my beloved wife, Nancy Apgar, all my estate, real and personal, as long as she shall be and remain my said widow, to use " &c.

He also said :

" It is my will, and I do order that after the death or marriage of my said wife Nancy, that the remainder of my estate I give unto my daughter Mary, the wife of Conrad Apgar, so long as she may live; and I do order, and it is my will, that after the death of my daughter Mary that all my estate go to the heirs begotten of her body, but I do order that all my real estate be and remain as it now *lyes* until the death of my daughter Mary."

The portion of the will which limits the use of the land to Nancy, the widow, and to Mary, the daughter, are given because the counsel for defendants seemed to think that the testator exhibits a strong desire to secure the actual possession of the land to his daughter, and that such desire should influence the court in determining the rights of the petitioner under the statute.

This view cannot be well founded. It is enough to say that the whole purpose of the act could thereby be defeated. If such view were to prevail, the question would be simply the construction of the will so as to ascertain the desire of the testator, and not the application of the statute.

The testimony discloses that the widow has remarried, and that Mary, the daughter, is fifty-eight years of age. Because of her advanced age it was urged that the case is not within the statute, the presumption being that she is beyond the age of pregnancy. My attention was directed to *In re Millner's Estate, L. R. (14 Eq.) 245*, in which case the wife was forty-eight years of age, and to *In re Widdow's Trust, L. R. (11 Eq.) 408*, in which

NOTE.—Courts have presumed that women were past child-bearing after they had reached a certain age: In *Leng v. Hodges, Jac. 585*, at sixty-nine; in *Miles v. Knight, 12 Jur. 666*, at sixty-eight; in *Brown v. Pringle, 4 Hare 124*, at sixty-six; in *Dodd v. Wake, 5 De G. & Sm. 226*, at sixty-five; in *Brandon v. Woodthorpe, 10 Beav. 463*, at sixty-three; in *Davis v. Bush, 8 Jur. 1114*, at fifty-nine; in *Edwards v. Tuck, 23 Beav. 271, 3 De G., M. & G. 40*, at fifty-seven; in *Lyddon v. Ellison, 19 Beav. 565*, at fifty-six; in *Haynes v. Haynes, 35 L. J. Ch. 303*, at fifty-three; in *Widdow's Trusts, L. R. (11 Eq.) 408*, at fifty-five; in *Forty v. Reay, 1 Dart's V. & P. (4th ed.) 320*, at fifty-three; in *Millner's Estate, L. R. (14 Eq.) 245*, at forty-nine; in *Groves v. Groves, 12 W. R. 45*, at fifty; in *Davidson v. Kimpton, L. R. (18 Ch. Div.) 213*, at fifty-four; in *Bacot's Case, MS. Oct., 1883, Van Fleet, V. C.*, at sixty-two.

In *Payne v. Long, 19 Ves. 571*, an inquiry as to the age of the mother was directed, and payments were made to the residuary legatees where, from the age of the mother, it became highly improbable that there would be any more children.

case the widow was fifty-five years of age, and to *Edwards* v. *Tuck, 23 Beav. 271.* But it is enough to say that these cases only re-assert the natural presumption against the capacity of procreation. They do not declare that that presumption is so potent as to obliterate the contingency which the statute hinges upon. See, also, *Leng* v. *Hodges, 1 Jac. 585,* and *Lyddon* v. *Ellison, 19 Beav. 565.* In this respect, therefore, the petition is on good grounds.

The petitioners have a vested interest in the fee and have a right to file this petition. Do they present a meritorious case? The first section of the act declares that if the interests of the owners of the particular and future estate in such lands require and would be promoted by a sale thereof, it shall be lawful for the chancellor to direct such lands to be sold in fee, and, for that purpose, to inquire into the situation of such lands and the merits of such application; "and if, upon such inquiry, it appears that the situation and prospective value of said lands are such that it be to the interest of any person who might own the same in fee to sell the same, then the chancellor shall direct such sale." This last clause evidently contemplates the interests of the owners of the fee only. It certainly subordinates, if it does not exclude, the interests of the owners of the particular estate. And it may be true that the legislature so intended, upon the ground that whenever the owner of the fee is benefited by a sale, the life

In *Coke upon Littleton 40 § 53,* it is said that "a woman above three-score years old hath had a child." In *Overhill's Trusts, 17 Jur. 342, 1 Sm. & Giff. 362,* the court refused to presume that a woman aged forty-nine was past child-bearing; in *Fraser* v. *Fraser, Jac. 586, note,* at fifty-five; in *Reynolds* v. *Reynolds, 1 Dick. 374,* at sixty-two; in *Jee* v. *Audley, 1 Cox 325,* at seventy; in *Croxton* v. *May, L. R. (9 Ch. Div.) 388,* at fifty-four; in *Conduit* v. *Soane, 24 L. T. (N. S.) 656,* at fifty-seven and fifty-two; in *List* v. *Rodney, 83 Pa. St. 483,* at seventy-five. See some remarkable cases referred to in *1 Beck's Med. Jur. (10th ed.) 650;* also *2 Dan. Ch. Pr. (5th ed.) *1795.*

The court refused to make an analogous presumption against a man, in *Trevor* v. *Trevor, 2 My. & K. 675, 677,* at eighty; in *Lushington* v. *Boldero, 15 Beav. 1,* at ninety-five; see *Wms. R. P. *53; 2 Bl. Com. *125; Coke on Litt. *28 a; Lomax* v. *Holmden, 2 Stra. 940; Alsop* v. *Bowtrell. Cro. Jac. 541.*

Where a gift is to a married woman for life, with remainder to her children for life, and a gift over to the grandchildren, evidence that the married woman was, at the date of the will, upwards of sixty years of age, and hence past the

tenant must necessarily be; that whenever the prospect is that the fee will not advance in value, the interests of all will be promoted by a sale, and that the interest of the money will be more advantageous to the life tenant than the net profits of the land. This rendering of the section may not be objectionable. It may be that careful observation and calculation have established the fact that when real estate, in a given condition, is not likely to advance in value, prudence requires that it shall be converted into cash. But I cannot think the legislature intended to ignore the rights or interests of the life tenant, and I shall consider this case from that standpoint.

The master reports that it will be to the interest of all concerned to sell the lands. The report has been excepted to. On the question of the prospective value of these lands, and the interest of the owners of the fee, more testimony was taken in my presence.

The question, therefore, remains, Will it be to the interest of all concerned to make sale of these lands? The burden is upon the petitioners. A large number of witnesses have been examined; amongst others, all the parties interested, including the husband of the life tenant. Of course this testimony, standing alone, can have but slight effect (see *In Matter of Heaton, 6 C. E. Gr. 221*), except so far as admissions are made against the

age of child-bearing, was held not admissible for the purpose of showing that children then living were meant, so as to make valid a gift over which otherwise was void for remoteness, *Sayer's Trusts, L. R. (6 Eq.) 319.*

There is no presumption of law that a deceased married woman was childless, *Hays* v. *Tribble, 3 B. Mon. 106;* or a deceased married man, *Wilbur* v. *Tobey, 16 Pick. 177;* *Campbell* v. *Reed, 24 Pa. St. 498;* *Dudley* v. *Grayson, 6 Mon. 259;* *Gladson* v. *Whitney, 9 Iowa 267;* *Payne* v. *Payne, 29 Vt. 172;* *Stinchfield* v. *Emerson, 52 Me. 465;* *Sprigg* v. *Moale, 28 Md. 497;* *Pile* v. *McBratney, 15 Ill. 314;* see *Allen* v. *Lyons, 2 Wash. C. C. 475;* *Emerson* v. *White, 29 N. H. 482;* *Harvey* v. *Thornton, 14 Ill. 217;* *Loring* v. *Stineman, 1 Metc. (Mass.) 211;* *King* v. *Fowler, 11 Pick. 302;* *Crouch* v. *Eveleth, 15 Mass. 305;* *University* v. *Johnson, 1 Hayw. 373.*

CONTRA, as to an unmarried man, *McComb* v. *Wright, 5 Johns. Ch. 263;* *Miller* v. *Beates, 3 S. & R. 490;* *Banning* v. *Griffin, 15 East 293;* *Rowe* v. *Hasland, 1 Wm. Bla. 404;* see *Oldnall* v. *Deakin, 3 C. & P. 402, 8 B. & C. 22;* *Hammond* v. *Inloes, 4 Md. 138.*—REP.

Apgar's Case.

interest of the witness.    That case also shows us the value to be placed on the mere opinions of witnesses.

I will endeavor to present the facts which must be my guide. Paul Apgar, the testator, died in December, 1855. His widow, who was entitled to the premises during life, or until she married, married in two years, when her daughter Mary, the present tenant for life, became entitled and responsible for the control. Then her responsibility as a life tenant began. She has all the rights of a life tenant.

Whether she has so performed all the obligations devolving on her as a life tenant, greatly protracted the examination before the master. The witnesses called by the petitioners regarded the premises as very much depreciated ; one witness thought the farm had depreciated $10 per acre; another, in all, $1,500, and others, without naming to what extent, thought there had been a depreciation, giving facts, as they supposed, on which their judgment was based. They think the land has been neglected and is not so good, and that the fences have been allowed to fall into decay, and that briers and bushes have been permitted to spread farther and wider along the fences, and the briers to spring up and grow on the land that used to be farmed, and that some of the farm land has been abandoned, and that no sufficient amount of fertilizers has been put on the land to preserve it in like condition. The declining rates at which the farm has been assessed, so far as such testimony may be called in to assist the judgment, seems to enforce these views. In the years 1857 and 1858 (the latter year Mary became entitled) it was assessed at $40 per acre, whereas in the years 1877, 1878, 1879 and 1880, it was assessed at $30, $27, $22.50 and $22.50 respectively.

The witnesses who were called by the respondents deny that there have been any such changes for the worse. They almost all think the farm is in as good condition now as when the testator died.

I think I am justified in saying that, whether the farm is in as good condition now as when the present life tenant took charge or not, it may be said to be in a dilapidated condition ; both the land and the fences are below what is ordinarily the re-

sult of good husbandry. This fact is important to the life tenant as well as to the remaindermen. It most certainly increases the burdens of the life tenant, and as certainly reduces her chances of profit from her estate, for as it requires more to keep a frail structure from falling, so it requires more outlay to keep an impoverished farm from getting worse.

After these observations, I desire to abbreviate the history of the life tenancy to the time of filing the petition, as given by the husband of the tenant. This narrative is important to show by unmistakable evidence the ability or inability of the present occupants to serve their own best interests, as well as the best interests of the remaindermen. The testator died in December, 1855. His widow had charge for two years. Then marrying, of course the life estate passed from her to her daughter Mary. But Mary still allowed her mother to have control of a part of the premises—sixty-three acres—for nine years, and she rented it to Harman Huffman for seven years, and after that to different ones on shares. Hope farmed part of it for two or three years, and P. P. Hoffman farmed some. Farley farmed some. This was the way it was done until five years before the petition was filed, when Mary, the daughter, and her husband, moved on the farm. Thus, from the spring of 1858 until the spring of 1877, the widow of the testator was allowed, by the real owner of the life estate, to control the farm. During all this time the daughter Mary lived near by, and her husband farmed four fields, or about thirty acres of the ninety-three.

The life tenant allowed timber standing on the premises to be cut and carried off. He sold four "tough butts" for spokes, and also some elms which grew in a "hedge row" along one of the fields, and some other wood or timber besides. However clearly this may be denominated waste, I think the whole value was small. Mr. Apgar, in detail, speaks of repairing the barn, the house, garden fence and some other fences, of building a new smoke-house, a corn-crib and an addition to the barn, and put on of his own rails about four hundred and fifty. Six or seven years ago, he put on one hundred and twenty-five bushels of lime, and some ten or more years ago he put some lime, not less than one

hundred bushels, on the other side of the field on which the one hundred and twenty-five bushels were put. Twelve or fifteen years ago, he limed over another field with two hundred or two hundred and fifty bushels. Eighteen years ago, he put two hundred bushels on another field. About two years before that, he put on two hundred bushels. As I understand the narrative, this lime was all put on the thirty acres which he farmed while he was living with his wife at other places, and none of it went on the sixty-three acres which remained under the immediate control of the testator's widow, although by marrying she had terminated her estate therein ; and as to this portion, there were about eight hundred bushels of lime put on while she enjoyed the possession, as Mr. Apgar gives it.

When Mr. Apgar was asked if any of the fields had been abandoned, he said :

"I think not; the plumb east field I had buckwheat in three or four years ago; it has not been plowed since; it has been pastured; until this season we haven't pastured it at all; about six years ago Aaron Apgar and John Alpaugh had buckwheat on it."

The line fences have been reasonably well preserved. Mr. Apgar says he lived at Cokesbury nine or ten years, and while there he got part of his firewood from off these premises. When asked why he had not limed the farm any during the last eight or ten years, he said : "I hadn't the money to spare to buy it." And when asked if any other reason, he said : "I don't think of any other reason." I have given his words that it may be seen whether or not my observation and conclusion are correct or not. The observation is that the farm must be greatly reduced if the owner of it and tenant of the life estate for twenty-four years, admits, through her husband, that it (a farm of ninety-three acres) has not produced enough to enable her to furnish any lime for it during the last eight years. The conclusion is : poor as the land may have been at the commencement of her estate, the management since has been very bad, indeed, to warrant such an admission.

I have referred fully to Mr. Apgar's statements and admis-

sions because I discover no reason to question his honesty as a
witness, and because his story seems, to the practical mind, to be
reasonable, and because his son Lewis J. gives testimony which,
in my judgment, fully corroborates him on the question of
ability to lime, although that point may not have been directly
in view.   Mr. Apgar says, in effect, that during the first sixteen
years he put on lime, in all about nine hundred bushels, on the
thirty acres, and that the tenants of the sixty-three acres put on
about eight hundred bushels, and that he has improved the out-
side fences, the barn, house and the like, but that is all he can
do; he cannot lime any more, for he cannot spare the money.
The son says he has been farming the place for a number of
years for his parents, and that it has afforded them all a living
and some money for improvements.   He found one horse and
his mother one to do the work on a farm of ninety-three acres,
a very large portion of which, I understand, is tillable.   He re-
ceived one-fourth of the oats and corn.   He thinks his mother
sold some grain in the year 1879; that she sold a little grain
almost every year; thinks she sold some corn in 1879, but can-
not remember his own share; got more corn in 1880 than in
1879; pretty nice crop of corn in 1881, more than three hun-
dred bushels; as to oats that year, could not say; in 1882 had be-
tween three hundred and four hundred bushels of oats altogether;
a good wheat and rye crop; two acres of wheat and three or four
of rye and twelve or thirteen of oats in 1882, and between eight
hundred and nine hundred bushels of corn-ears.

I am quite clear that this statement of the son corroborates the
father, and proves that this tract of land is so far reduced that it
produces, under present management, but little more, if any, than
a living for the occupants; for it is plain that after the expenses
of farming and of the household and the taxes are deducted from
the products named, but little remains.

And in this there is quite strong proof of the inability of the
life tenant to manage the farm according to the ordinary rules
of good husbandry.   Mr. Apgar says he did put lime on twenty
years ago, sixteen years ago, twelve years ago and eight years
ago, but has not put any on since, not because the land does not

need it, nor because it will not improve the land, nor because the life tenant was not obliged to, but because he has not the money for that purpose. I think it will be admitted that this fact is of great importance in a question of this nature.

These facts—the dilapidation of the fences, the depreciation of a considerable portion of the land from careless farming or an abandonment of portions, and the inability of the life tenant to stay the work of decline or depreciation—lead me to the conclusion that unless there is something extraordinary in the case, the interests of all parties will be promoted by a sale. As the chancellor said in *Herring's Case, 8 Stew. Eq. 359,* an owner of the fee in like situation would be benefited by a sale. I think the decline that appears and is likely to ensue from the confessed inability of the life tenant, will be greater than any appreciation in value that can reasonably be expected.

But it is urged that there are "family reasons" against making a sale at this time. It is claimed that though the court might be with the petitioners on the general principles which govern in such cases, yet the condition of the life tenant and her relation to her aged mother should overcome all and stay the arm of the court. It is said the court acts with reference to these considerations, to sustain which *Herring's Case* is relied on. I think it material to observe that the property in that case consisted of the homestead and two other lots in Hackensack, and two small wood-lots, *and not a considerable tract of farm land.* The master advised a sale, and the chancellor said his recommendations were judicious and his report should be confirmed.

But to proceed with the facts relied on by the defendants. They say that the life tenant is fifty-eight years old and almost blind, and that her mother is seventy-nine years old and very feeble and dependent on the life tenant for support; and that the husband of the life tenant is sixty-five and is past the age of hard work, and that in this condition they are dependent on this land and the two children who remain at home with them for support.

This view very powerfully confirms the previous argument in favor of a sale. It helps greatly to establish the inability of the

tenant. But we are considering the interests of the family. It is said, upon the argument, that although Mrs. Apgar does not farm much and often has but little grain, yet she can and does keep her "cows and chickens and pigs" on the place, and have a home for herself, mother and those who care for them, and be comfortable; and that they have much more in all these than they could possibly receive from the interest of the money which the land would produce.

The burden of taking the cause out of the general rule, because of such allegations, rests with the respondents. What does the testimony show? I can discover nothing that shows the real value of her cows or chickens or pigs. But whatever their value may be, it enters into the gross receipts and forms a portion of the fund from which the draft is made to carry on the farming operations. Nor have we the amount of the gross receipts. But we know, after they have been drawn upon for all other purposes, that there is nothing left to purchase lime with, and has not been for several years. This is according to Mr. Apgar's plain admission, and he is sustained by the details, given by his son, of the grain raised. He says that out of this grain his mother made some improvements, which no doubt applied to the improvements on the buildings.

I am not satisfied, from the testimony adduced, that it will be to the interest of the life tenant to deny the prayer for sale. My judgment is, from her own witnesses' story, that under her management as a life tenant, the burden of keeping the farm in a proper condition, according to the rules of good husbandry, is more than she can bear. She cannot arrest the decline which I think has been begun. Her situation will not improve. I think the interest of the money produced by a sale will prove more beneficial to her, with her cows, chickens and pigs, else-where—on less land, where she will have lighter burdens—than on this farm.

Two of the remaindermen are defendants; one, a daughter, earns a living and boards with her mother on these premises; the other, the son who rents the place of his mother and farms it on shares. Under the circumstances of this case, I think this

Apgar's Case.

son is not in a position to be heard resisting this petition. It may be greatly to his interest to prevent a change. He has the same right to rent and to farm the place that a stranger to the inheritance has, but the account that he renders shows that the inheritance is suffering under the treatment in which he has a hand. Though not primarily responsible under the law, yet, considering his position, why should not he make such terms as would enable him to lime the land and to farm all portions of it according to the ordinary rules of good husbandry, and not to abandon any or to allow briers to be growing on once cultivated portions? Why should he not make such terms as would enable him to preserve the assessable value of the property in the years 1880 and 1881 as high as in 1875 or 1876, or in 1858, when the life tenant, his mother, became entitled? It was during his tenancy that the insurance on the buildings was allowed to expire, and the buildings to remain uninsured for some time. He is more responsible for this than his almost blind and helpless mother.

The great consideration given to this case by the counsel for the defendants seems to justify, if not to require, these details, whether they shall be accepted as correct or not.

I will advise a decree overruling the exceptions and confirming the report of the master