SKINNER *against* DAYTON and others.

The plaintiff and others formed an association for manufacturing, &c. and executed articles of agreement, as to the mode of managing and conducting their business : *Held*, that the company could only act by a resolution of the board of directors, or by a general agent, duly appointed, pursuant to the articles of their association ; and that the plaintiff, who had been elected *president* and was, *ex officio*, a director, having entered into a contract, under his hand and seal, in behalf of the company, without such authority from the board of directors, or the consent of the members, it did not bind his associates, but, the plaintiff was personally and individually liable.

Where the plaintiff, who had so entered into a contract with the defendants for machinery to be made for the company, afterwards, gave notice to them, that the company would not proceed, and that the contract was abandoned on their part : *Held*, that the defendants were entitled to recover damages for the work done, and materials furnished, by them, pursuant to the contract, and also for the loss and injury actually sustained by them, in consequence of the abandonment of the contract by the plaintiff ; and that they were not to be delayed in their right to have the damages assessed and levied, by judgment and execution, until the question of *contribution* between the plaintiff and his associates was settled.

But, it seems, that the plaintiff, in such case, having acted without authority of the directors, or of the members of the association, is not entitled to call on the company or any of his associates to contribute to the damages.

THE original bill, filed the 28th of *September*, 1816, by the plaintiff, against *John White, Marvin White, Rudolph Taylor, Abraham Dayton, Reuben Wheeler, William Raymond, jun., Nathan H. Raymond, Abner P. Hitchcock,* and *Nathan Doane,* stated that the plaintiff, and *Dayton, Wheeler, W. Raymond, jun. N. H. Raymond, Hitchcock, Doane,* and *Ira Hall,* on the 10th of *April,* 1815, by articles of agreement subscribed by them, called the constitution, formed an association together, for manufacturing cotton yarn and

*April* 11th,
and
*July* 16th.

1821.

SKINNER
v.
DAYTON.

cloth, to be known and distinguished by the name of "The *Granville Cotton Manufacturing Company.*" An election for officers was to be held on the first *Monday* of *May*, in each year, who were to be chosen from among the stockholders, to wit, a *president*, who should be, *ex officio*, one of the directors, two, and not more than four, *directors*, and a *treasurer* : It was made the duty of the *president* and *directors* to appoint a *general agent*, whose duty it should be to purchase stock, and vend the goods of the company, and under the particular direction of the president and directors, to transact all such business, as they should deem best calculated to advance the interest of the company ; also a *clerk*, whose particular duty it should be to keep an account, &c. The duty of the treasurer was to keep all deeds, records, vouchers, papers &c. receive and pay all moneys, &c. Each person, at the time of subscribing, was to pay on each share *ten* dollars, and from time to time, such assessments, as should be made by the president and directors, or forfeit such share or shares, with all previous payments made thereon ; each stockholder to be entitled to one vote for each share : and the stock to be divided into twenty shares. This agreement was subscribed by the parties above named, and *White, Taylor* and *White* who took two shares. Under this agreement, the plaintiff was elected *president*, and *William Raymond, jun.* and *Abner P. Hitchcock*, directors, and *N. H. Raymond*, treasurer.

On the 25th of *April*, 1815, an agreement was entered into between " *White, Taylor* and *White, of Troy,* and *R. Skinner, W. Raymond, jun., A. H. Hitchcock*, as directors of the *Granville Cotton Manufacturing Company*," by which *White, Taylor* and *White*, promised and engaged to make and deliver at the factory, to be erected in *Granville*, of the best materials, and best workmanship, *twelve* throssel frames, &c. (describing the machines,) to wit, six frames, in the month of *October* following, and six other

frames on the 1st of *May*, 1816; and the plaintiffs, *Raymond* and *Hitchcock*, in behalf of the company, engaged, to pay to *W.*, *T.* and *W.* 15 dollars for each spindle, or 15,120 dollars, as follows: 900 dollars in 35 days, and 500 dollars in every 30 days thereafter, until the machinery was in full operation, when the balance was to be paid. This agreement was signed and sealed by *W.*, *T.* and *W.* and by the plaintiff, " for the directors."

The bill stated, that the constitution of the company was made known to *W.*, *T.* and *W.*, before the execution of this agreement, and that they agreed to become subscribers for two shares, on condition of being employed by the company to make the machinery, provided that they should be exempted from any *assessment* made, or to be made, until the machinery was completed, and the factory in operation. That the president and directors raised, by assessment, about 1,100 dollars to pay for land purchased; and on the 27th of *April*, 1815, they laid another assessment on 18 shares of the stock, of 50 dollars each; that *J. H.*, *A. D.*, and *R. W.* paid their assessments, amounting to 350 dollars; but the other stockholders refused to pay, and thereby forfeited their shares, with all previous payments made by them. That the president and directors, in about three days afterwards, gave written notice to *W.*, *T.* and *W.* that by reason of these forfeitures, the company would not go on with their factory, and that the contract made with *W.*, *T.* and *W.*, could not be performed; and that *N. H. R.*, who delivered the notice, was told by them, or one of them, that they had made no contracts for the machinery, but had done something towards making the frames. (This, however, was denied in the answer.) The bill further stated, that since the forfeiture of the shares, the plaintiff had paid, out of his own funds, 217 dollars and 94 cents, which had not been reimbursed; that the company had become insolvent; that one of the associates had absconded, and another was in prison for debt; and that the copartnership was dissolved, and its debts were to be paid

by *M. White.* That in *August,* 1815, *W., T.* and *W.* brought a suit in the Supreme Court, against the plaintiff, for a breach of the covenants contained in the above mentioned agreement, alleging, for breaches, the non-payment of the 900 dollars in 35 days, and of 500 dollars on the 20th of *June,* and 500d ollars on the 20th of *July,* 1815. That the plaintiff pleaded the general issue, and specially, that the agreement was executed by the plaintiff and the two other directors, in their capacity of directors, and not otherwise ; and that on a demurrer to this plea, the Supreme Court gave judgment against the plaintiffs.* That the appellant gave notice to the other partners, of the suit, but they declined doing any thing. That *Ira Hall* died the 18th of *September,* 1816, having, as he had heard, made a will, but that no letters testamentary or administration had been granted. The bill *prayed* for a discovery, and an injunction to stay all further proceedings at law, and for general relief.

* Vide 13 Johns. Rep. 307.

On the 26th of *January,* 1817, *Marvin White* filed his separate answer, stating that *Randolph Taylor, John White,* and himself, were partners in the business of making machinery for cotton manufactures. He admitted that he signed, in behalf of the firm, the agreement stated in the bill; he denied that he agreed or expected to look to the members of the association for the performance of it, on their part ; but relied wholly on the liability and responsibility of the plaintiff, for the fulfilment of the contract. He admitted, that in *May,* 1815, *N. H. R.* delivered him a letter from the plaintiff and the two directors, stating that several shares had become forfeited, and that the remaining stockholders would be obliged to abandon the business, unless some alteration was made in the contract, and that *N. H. R.* was authorized to agree to such alteration ; but he denied, that the letter contained any notice that the company would not go on, or that the contract made with the plaintiff would not be performed. He also denied, that he told *N. H. R.,* that they, *W., T.* and *W.* had made no contracts for machinery, &c. but the

contrary. That no proposals as to alterations, were, afterwards, made by the plaintiff, or any other person. That immediately after the contract, he commenced the work on the machinery, and continued the work, until the 1st of *August* following, when he received a letter from the plaintiff, dated *July* 24th, which convinced him that the plaintiff did not mean to perform the contract; that this letter was the first notice *W., T.* and *W.* had of the intention of the company not to go on, and which he considered as amounting to a notice of the abandonment of the contract, and a refusal to perform it. That the wages of the workmen employed on the machinery, at that time, amounted to 2,377 dollars and 34 cents, and the cost of the materials purchased, to 882 dollars and 66 cents. That when the letter was received in *August*, *W., T.* and *W.* were solvent and in good credit, and would have executed the contract, if the plaintiff had performed on his part; and that their subsequent insolvency was produced by the losses sustained in consequence of the failure of the plaintiff to perform the contract on his part. That the work and materials finished, at the expense of 3,300 dollars, had become useless, and were not worth 400 dollars, &c.

On the 28th of *June*, 1817, *John White* filed his separate answer, which agreed, substantially, with that of *M. W.*

Dayton, Wheeler, W. Raymond, N. H. Raymond, A. P. Hitchcock, and N. Doane, filed their joint and several answer, on the 13th of *January*, 1817. They all denied that the contract with *W., T.* and *W.* was made with their approbation or consent, but, on the contrary, they had frequently expressed their disapprobation of it; and they denied that the plaintiff had any authority to make the contract in behalf of the company, or that he was the agent of the company, by any appointment as such. They all stated, that the company was indebted to them for advances out of their individual funds, the amount of which advances was stated by them respectively.

On the coming in of the answers, a motion was made to dissolve the injunction, which had issued; and the Chancellor, after argument, on the 28th of *August*, 1817, ordered the injunction to be dissolved. (*vide S. C.*, vol. 2. p. 526.) The plaintiff appealed from this order, and the Court for the Correction of Errors, in *March*, 1819, reversed the decretal order, (*vide* 17 *Johns. Rep.* 357—373.) and decreed, that the injunction be continued until the hearing, on the appellant's confessing judgment in the suit at law, with leave to the respondents to enter up the same; and that proceedings be had in the Court of Chancery, either by a reference to a master, or an issue at law, to ascertain the damages, if any, sustained by the respondents, by the non-execution or rescinding of the contract, on the part of the appellant, and that the respondents levy those damages only on the execution; and that the record be remitted, &c.

*Abner P. Hitchcock*, afterwards, died, and the suit was duly revived against *Anna Hitchcock*, executrix, and *Phineas Hitchcock*, executor, &c. And *Ira Hall*, having died on the 18th of *September*, 1816, *Rebecca Hall*, his executrix, *John C. Parker*, *Clark Northrup*, and *Isaac Hollister*, his executors, were also made parties to the suit, and filed their answers on the 14th of *May*, 1818. They stated, that their testator, and they, as his executors, had paid above 1,900 dollars, on account of the company.

General replications were filed, and witnesses examined by both parties, and various exhibits proved.

Several witnesses testified that they heard *Hall*, *Hitchcock*, *N. H. Raymond*, *A. Dayton*, and *W. Raymond*, jun., express their disapprobation of the contract, the day on which it was made; and that they heard the plaintiff say, on that day, that he "had made a good day's work, and run the company in debt 15,000 dollars," or, as two of the witnesses testified, "that he had run the company in debt, that day, to the amount of 15,000 dollars, and that he did

not know how the company would like it ;" and that *N.* *H. Raymond* immediately expressed his surprise and disapprobation.   One of the witnesses stated, that there was an understanding between the company and *W.*, *T.* and *W.*, that the latter should give in their proposals, and allow the company ten days to consider of them ; but the plaintiff concluded the contract on the same day it was made.   One witness stated, that he was present when the contract was read in the presence of *Ira Hall*, before its execution, and he made no objection to it ; and that he heard *W. Raymond,* jun. tell the plaintiff before the contract was executed, as he was going out, being in a hurry, that he should be satisfied with the contract the plaintiff should make.   It was proved, by an exhibit in the cause, that *W. Raymond,* jun. had confessed, that he had used language from which the plaintiff had reason to believe, that he had his approbation and consent to make the contract, for he said to him, that after advising with *Hitchcock* and *Hall,* he must do as well as he could, and that he, *R.* would be satisfied.   One of the witnesses deposed, that he heard *Hitchcock* say, that an assessment of 60 dollars on eighteen shares, had been laid by the directors, and that 50 dollars of the assessment was to meet the first instalment of the contract with *W.*, *T.* and *W.*

*April* 11th, 1821.   The cause came on to be heard on the pleadings and proofs.

*Henry,* for the plaintiff, contended, that it should be referred to the Master, 1. to ascertain and report, *in what respects* the defendants, *White, Taylor* and *White,* had executed the contract of the 25th of *April,* 1815, mentioned in the pleadings, between them and the defendants, *Raymond* and *Hitchcock,* as directors of the *Granville Cotton Manufacturing Company,* and whether *W.*, *T.* and *W.* had sustained any, and what *damages,* by the non-fulfilment of the contract on the part of the company.

2. That the Master, also, ascertain and report in what *proportion* the plaintiff, and the defendants, (except *W., T.* and *W.*) respectively, should *contribute* to the payment of such damages.

3. That it should, also, be referred to the Master, to ascertain and report, whether there is any, and what *real estate*, and of what value, held by or in trust for the *Granville Manufacturing Company*, and who are entitled thereto, and in what proportions ; and whether the same be susceptible of partition, and without prejudice to the owners ; and also, to take and *state an account* between the defendants, (except *W., T.* and *W.*) relative to the estate, property, and concerns of the *G. M. Company*, and as to such sums as may be due to the same defendants, respectively to each other, and to make report thereof, *to the end* that such a decree may be thereupon made as should be just.

*Buel,* and *Van Vechten,* for the defendants, *White, Taylor* and *White,* contended, 1. that the plaintiff was personally and individually bound by the contract. That this was its legal construction, and that it was so determined by the Supreme Court, in its decision on the demurrer, and by this Court, on the motion to dissolve the injunction, and by the Court of Errors, on the appeal from the order of the Court dissolving the injunction. The construction, therefore, of the contract, had become *res judicata.* (13 *Johns. Rep.* 307. 2 *Johns. Ch. Rep.* 532. 17 *Johns. Rep.* 366. S. C. *in Error. Tippets* v. *Walker,* 4 *Tyng's Mass. Rep.* 595.)

2. That the only course for this Court, was merely to give directions, as to the *damages* which the defendants, *W., T.* and *W.* were entitled to, against the plaintiff, under the reference ordered by the Court of Errors.

3. That the defendants, *W., T.* and *W.,* had nothing to

do with any right of contribution between the plaintiff and his associates. That was *res inter alios.*

*Z. R. Shepherd,* for the other defendants, except *White, Taylor* and *White,* contended, 1. That the plaintiff had no authority to bind the *Granville* Manufacturing Company, by the contract with *W., T.* and *W.,* neither by virtue of his office, as president and director, nor as a member of the association.

2. That there was not sufficient evidence of the *assent* of the members of the association to the contract, to render them liable to *contribution.*

3. That the contract made by the plaintiff, was so imprudent and improvident in its nature, as to show a total disregard to the interests of the company, and it would, therefore, be unjust to compel them to contribute.

*July* 16th. The cause stood over for consideration to this day.

THE CHANCELLOR. The bill in this case had two objects : 1. To obtain a liquidation, upon equitable principles, of the demand of the defendants, *White, Taylor* and *White,* for damages, for the non-fulfilment of the contract of the plaintiff with them : 2. To compel the other defendants, who were members of the *Granville Cotton Manufacturing Company,* to account to and with the plaintiff, and to *contribute,* proportionably, to the payment of the damages to be assessed in favour of *White, Taylor* and *White.* The prayer of the bill is, that they may be decreed to pay whatever sums the plaintiff " may be obliged to lay out and expend on the contract aforesaid, or in defence of the suits at law, against him."

The defendants, *White, Taylor* and *White,* are entitled to a just indemnity, for the loss and injury sustained by them. The decree of the Court of Errors, in this very case, directed this Court, by a reference, or an issue, to ascertain the

damages, if any, sustained by *White, Taylor* and *White*, by the non-execution or rescinding of the contract on the part of the present plaintiff.

The *Chief Justice*, in the opinion delivered by him in the Court of Errors, in this case, (17 *Johns. Rep.* 365.) declared, that *White, Taylor* and *White*, were entitled to be fully remunerated, for all the damages and losses they had actually sustained; and that he should consider a loss of profits as a legitimate head of damages; and, in short, that they were entitled " to a just equivalent for their labour, materials, and loss of profit." Mr. Justice *Yates*, in the opinion which he delivered in that case, (17 *Johns. Rep.* 368, 369.) only said, generally, that *White, Taylor* and *White*, were entitled to " compensation and damages," to be fairly and satisfactorily ascertained, by a reference, or by an issue. To meet the sense of the Court of Errors, as far as we may venture to infer it from those two opinions, (for the decree speaks only of the damages,) and as far as the rule of damages can be prescribed, with justice and precision, I shall direct the master, in order to ascertain and report the damages sustained, to state and report, particularly, the amount due for the work done, and materials furnished, and for all other expenses, by *White, Taylor* and *White*, actually and *bona fide* incurred, under the contract, prior to the first day of *August*, 1815, when all further execution of the contract was abandoned, by reason of the notice of the inability, or refusal, of the plaintiff to fulfil it. And I shall further direct, that he ascertain and report, in addition thereto, the amount of the actual loss and injury (if any) which these defendants sustained, by reason of such abandonment of the contract.

2. The next point, is, whether the plaintiff is entitled to *contribution* from the remaining defendants, in respect to those damages?

The decision of the Supreme Court, upon the contract now in question, was, that the plaintiff contracted with *White*,

1821.

SKINNER
v.
DAYTON.

*Taylor* and *White*, in his personal, or individual capacity, and was bound to answer, in his own person and estate, for the damages. This was, also, my opinion, when the cause was formerly before me, on the motion to dissolve the injunction ; (2 *Johns. Ch. Rep.* 526.) and the decree of the Court of Errors assumes the same principle, when it declares, that *White, Taylor* and *White* were to levy, on their execution at law, the damages to be assessed in this Court. (17 *Johns. Rep.* 373.) I apprehend, then, that the defendants, *White, Taylor* and *White*, have no concern with this question of contribution, and that they are not to be delayed in their right to have their damages assessed and levied, until the question of contribution is settled. A similar point arose before me, in the case of *Brinkerhoff* v. *Lansing*, (4 *Johns. Ch. Rep.* 65.) and the same opinion was declared. But the point itself becomes immaterial at present, for, upon a consideration of the case, it does not appear to me, that the plaintiff is entitled to charge the other members of the association, in their individual persons, or property, nor, perhaps, even to the amount actually paid in upon their shares, for any part of the damages.

The company could not be bound, beyond the capital paid in, and the president and directors had no power, under the articles of association, to bind the members, individually. Whoever dealt with the company, as such, and without resorting to a personal covenant, was to be presumed to deal with them, according to the terms of their constitution, and to give the credit to the funds of the company, actually paid in, or to be paid in, under assessments duly made. He had no right to look to the credit of the individual members, unless these individual members entered into a personal covenant, or contract. As a check to extravagance and abuse, in the management of the company concerns, every member, under the 6th article, reserved to himself the right to withdraw himself from fur-

ther responsibility, by refusing to pay any more assess-ments, under the penalty of the forfeiture of his shares, and of all previous payments made thereon. This construc-tion is the only reasonable and just one ; and it cannot be supposed, that individuals, who consented to take certain shares upon these terms, intended to place their whole for-tunes at the power and disposal of the directors. There is no such power to be inferred in this case ; and if such was to be the construction, it would lead to the most alarming and distressing consequences to the members of the numerous associations, of a similar nature. When a man enters into a commercial copartnership, he certainly, as Lord *Kenyon* observed, "commits his dearest rights to the discretion of every one, who forms a part of that partnership in which he engages. One partner may pledge the credit of the other to any amount." But the persons who composed the association in this case, were not part-ners, in a commercial sense, so as that the promise of one would bind the others personally : they were rather part owners, and tenants in common, possessing aliquot shares in the common stock, and with an authority, perhaps, vest-ed in the directors, to control the disposition and manage-ment of it, and to bind the capital to the extent collected and paid in. Any member of the company could withdraw himself from further contribution under the assessment, by the forfeiture of his shares.

The plaintiff, by his contract of the 25th of *April*, 1815, with *White, Taylor* and *White,* had no right to bind the company, or even the capital stock paid in. He had no authority, even from the directors, to make this contract ; it was an act entirely unauthorized. The company could not act and contract in its associate capacity ; but by a resolution of the board of directors, or by means of a general agent, duly appointed by such a resolution, in pursuance of the 4th article of the constitution of the com-

pany : Nor did the assessment of the 27th of *April*, made subsequent to the date of the contract, impose any other, or further obligation on the members of the company, than to pay that assessment, or submit to the forfeiture. It was no ratification, by the company at large, of the contract in question ; and though the assessment may have been made purposely to meet the first instalment under that contract, and though this fact may have been known to all the members of the company, yet they were not chargeable with any breach of faith in refusing to pay, and in submitting to the penalty. They only exercised a right reserved to them by the constitution of the company, and the contract was not their contract, nor made by any agent of theirs, duly authorised for that purpose. Neither the plaintiff, nor *White*, *Taylor* and *White*, could complain of any surprise, or imposition, by the refusal of the members to pay ; for they were subscribers to the articles of the association, and knew the tenor of them. Nor did the resolution of the directors, calling for that assessment, impose any personal obligation upon the two directors, *Hitchcock* and *Raymond*, to fulfil that contract, or unite with the plaintiff in a personal responsibility. There was no personal assumption of the contract by that resolution. It only shows, that those directors were willing to meet the contract, *quasi* directors, so far as the company were willing to furnish the funds. The letter of the plaintiff, and of those directors, of the date of the 20th of *May*, 1815, to *White*, *Taylor* and *White*, contained nothing more. As far as funds had been furnished, so far, possibly, those directors, in their official capacity, were bound to comply with the contract in question, but no further.

I have already observed, that there is not the requisite evidence, that the two directors, *Raymond* and *Hitchcock*, ever authorised the making of the contract. The association was a regularly organized company, with a president and directors, treasurer, and clerk to the board ; and we

may safely ask, where is the resolution of the board, reciting and approving of the contract in question, or giving to the plaintiff general powers to make a contract, in his discretion? The absence of any such resolution, is sufficient to warrant the conclusion, that the contract was never submitted to the consideration of the board of directors, and that it never received their united deliberation and consent. The two directors, as well as the other individuals of the company, in their answer, deny, that they ever gave any such assent; and the weight of evidence is in support of the answers, and decidedly shows, that the plaintiff made the contract at his own risk, and upon his own judgment, without the authority, consent, or advice, either of the directors, or of the members at large.

There is some contrariety of testimony, respecting the assent of *W. Raymond*, jun., the director; but the assent pretended, or alluded to, by some of the witnesses, was too loose and equivocally expressed, to be of any force. It was not the assent intended by the creation of the board of directors. The directors, *quasi* directors, could not deliberate and act, but in their joint capacity. Here was no joint consultation or discussion of the board; and it would be idle, and quite repugnant to good sense and sound construction, to consider loose conversations with one individual, and then with another, in succession, when they were not assembled as a board, as amounting to any thing on the part of these persons, *as directors*, or as giving any validity to the precipitate and rash conduct of the plaintiff. To bind the directors, and through them, to bind the funds of the company, the directors must have assembled in council, and deliberated concurrently, and unitedly, and expressed their assent, by a resolution, duly announced and recorded. To reduce their assent down to mere street conversation, with them, successively, in detail, would be to subvert the meaning and utility of the institution of such a council, and destroy all the check and safety, which was in contem-

plation. And, however contradictory and uncertain the testimony may be as to *Raymond*, there is uncontradicted proof, that the other director, *Hitchcock*, expressed his dissent from the contract. So did *Hall*, *Dayton*, and *N. W. Raymond*, express their disapprobation; and several witnesses testify, that the plaintiff himself, on the day he made the contract, and immediately after it was made, was sensible of his want of authority to make it; for he observed, that "he had run the company in debt this day, to 15,000 dollars, and he did not know how they would like it."

There is, then, no well founded pretence on the part of the plaintiff, of a right to call on the company at large, or on one individual of it, to contribute to the damages which *White*, *Taylor* and *White*, may recover against him. He was no general agent of the company. There is no evidence of such character given to him. And if he was a special agent, by being president, yet a special agent, constituted for a particular purpose, and under a limited power, cannot bind his principal, beyond his authority. This is a very clear and settled rule. (*Nixon* v. *Hyserotts*, 5 *Johns. Rep.* 58. *Gibson* v. *Colt et al.* 7 *Johns. Rep.* 390. *Fenn* v. *Harrison*, 3 *Term Rep.* 757. 2 *Emerigon*, 384. 443.) But the counsel for the defendants (*White*, *Taylor* and *White* excepted) observed, at the hearing, that he was authorized to agree to a reference, and to an accounting in respect to the purchase of the land on which the manufacturing house was built, and as to the expenses incurred in building the factory; and so far a reference may be had, as between the plaintiff and the residue of the defendants. But this reference is to have no connection with the one in respect to *White*, *Taylor* and *White*, and it is to be conducted, as if the suits were distinct. Under this view, I shall grant the reference acceded to.

*Decree accordingly.*