THE ULSTER COUNTY SAVINGS INSTITUTION, Respondent, *v.* THE FOURTH NATIONAL BANK OF NEW YORK, Appellant.

*Supreme Court, Third Department, General Term, December* 11, 1889.

1. *Pleadings. Counterclaim.*—A counterclaim for the damages, which a correspondent bank was compelled to pay by reason of an invalid sale of stock made by it for its principal, may be set up in an action for an accounting between them.

2. *Principal and agent. Banks.*—A correspondent bank, to which shares of stock have been forwarded to sell, may sell a part, if it cannot sell the whole, or a part to one and the rest to another person, unless special directions to the contrary are given.

3. *Same.*—It must take the customary course in making such sales, and is liable for loss arising from neglect to do so.

4. *Same. Broker.*—The wrongful refusal of the company, which issued the stock, to transfer it on its books, does not excuse a broker, who sold it at the request of the correspondent, for his failure to deliver it to the purchaser.

5. *Same.*—The collecting agent must indemnify its correspondent for loss arising from want of power in the principal to procure a transfer of the stock.

6. *Same.*—Each collecting agent, if he acts in good faith, is entitled to be indemnified for loss by his immediate principal.

7. *Executor, etc. Authority.*—An administrator, appointed in one state, has, as such, no authority beyond that state.

8. *Same.*—Where stock is sent, under an administrator's directions, by one bank to another, with the usual form of letter used by the former in correspondence, the acts of the former's treasurer, so far as the latter bank is concerned, are done in his official capacity, and not as agent for the administrator.

9. *Same.*—The forwarding bank must know or ascertain the administrator's power to transfer the stock, when it employs a bank to send the stock for sale to the latter's correspondent, and is, therefore, liable for any loss incurred by the latter from such want of power.

10. *Appeal. Reviewable.*—An order denying leave to file a supplemental answer cannot be reviewed on an appeal from the judgment.

11. *Same.*—An appeal should have been taken from the order refusing leave to serve the supplemental answer.

Appeal by defendant from a judgment entered in favor of the plaintiff after a trial at the circuit by the court without a jury. Also from an order of the special term denying a motion for leave to interpose a supplemental or amended answer.

*David Wilcox*, for appellant.

*A. T. Clearwater*, for respondent.

LEARNED, P. J.—This is an action to recover an alleged balance of account. The defense is a counterclaim. And the questions in the case arise on the counterclaim.

After issue joined, the defendant applied to the special term in September, 1880, for the removal of the cause to the

circuit court U. S. N. D. N. Y. on the ground that the suit and matters in dispute arose under the laws of the United States. The motion was denied. On appeal by defendant the order of denial was affirmed by the general term in February, 1881.

In June, 1881, on an affidavit, the defendant asked leave to serve a supplemental answer, duly verified, setting forth the fact that defendant had presented said petition and the usual bond, and had, on the 18th day of October, 1880, filed a copy of the record in the circuit court U. S. N. D. N. Y. and averring that thereby this cause was removed to said court and this supreme court was ousted of jurisdiction. The court at special term denied the motion.

The cause afterwards came on to be tried before the special term in September, 1887, and a decision was rendered for the plaintiff, rejecting defendant's counterclaim. Judgment was entered and defendant appealed, stating in the notice of appeal its intention to bring up for review the order denying the motion for leave to serve a supplemental answer. Accordingly the defendant, in making up the case for the appeal, inserted therein the supplemental answer and the affidavit on which said motion for leave to serve such answer was made; and also the order denying such leave.

Upon settlement of the case an order was made striking out said affidavit and supplemental answer from the case; and from that order the defendant also appeals.

It was held in Illius *v.* N. Y. & N. H. R. R. Co., 13 N. Y. 597, that the order of the general term affirming the refusal to transfer the case was not appealable. If this be correct, the defendant could not by appeal have that order reversed.

But the defendant could do what was done in a similar case. Stevens *v.* Phœnix Ins. Co., 41 N. Y. 149. It could set up the facts showing that the cause ought to have been, and perhaps legally was, removed, and it could then prove these facts on the trial, and thus claim before the court of appeals, on appeal from the judgment, a reversal for want of juris-

diction. This the defendant attempted to do, but the privilege of setting up these facts by supplemental answer was denied.

An appeal from a judgment brings up for review an intermediate order which necessarily affects the final judgment. The question, then, is whether the refusal to permit the supplemental answer necessarily affected the final judgment. It seems to us that this privilege of reviewing, on appeal from final judgment, an intermediate order, is not to be extended beyond the strict language of the section. A party against whom an order is made by the special term may appeal to the general term. If he neglects to do this within the proper time, it is not reasonable that he should, after the cause has been tried and decided, bring up this order unless it necessarily affects the judgment.

The defendant says, and says correctly, that if the proceedings for removal are regular in a proper case, the state court is ousted of jurisdiction, whether the order of removal is granted or denied. Shaft *v.* Phœnix Ins. Co., 67 N. Y. 544. If defendant, then, is correct as to the law respecting the right to remove this case, as to which, see Leather Man. Bank *v.* Cooper, 120 U. S. 778, this court has no jurisdiction. But whether the order refusing to permit defendant to serve a supplemental answer necessarily affected the final judgment is another question. It may be that if an appeal had been taken from that order we should have reversed it. Whether, if the order had been granted, the final judgment would have been different depends, partly at least, on what might be proved under the supplemental answer. And clearly there must be a uniform rule as to all refusals to permit supplemental answers being reviewed on appeal from judgment. We therefore think that the order denying leave to file the supplemental answer, whether correct or not, cannot be reviewed on this appeal from the judgment. In this view we see no reason to reverse the order striking out that part of the case.

The defendant, on the trial of the case, proved the facts claimed to show a removal of the case as aforesaid and objected to any proceedings on the ground that the cause was now pending in the circuit court U. S. N. D. N. Y.; and again moved on like ground for a dismissal. We are aware of the decision in Pacific Railroad Removal Cases, 115 U. S. 1, and of the Leather Man. Bank Case above cited. But we are not prepared to say what the effect of the statute of 1882 is upon this case. And as the question of removal was once before us, we think it best to adhere to the decision then made. With great respect for the court whose decisions were last cited, we do not see how a claim for money against the defendant, whose corporate existence is admitted, is a suit arising under the laws of the United States any more than a similar action against a man who had once been a slave would be a suit arising under the laws of the United States, on the ground that his right to sue and be sued was given by the fourteenth amendment.

This brings us to a consideration of the merits.

The learned justice who tried this case held that whatever acts were done by Ostrander, the treasurer of plaintiff, in the matter in question, were done as agent for the administrator, and not as treasurer of the bank. We cannot agree with this conclusion, so far as the defendant is concerned. The plaintiff kept an account with defendant. The account in part is given in evidence. It shows, among other things, October 11, 1877, 100 Lake Shore, $7.037.50, indicating a sale of stock by defendant for plaintiff. The scrip in question was sent in a letter of the form used for years in plaintiff's correspondence with defendant. The defendant could not inquire whether the scrip belonged to plaintiff or not. Plaintiff might have had an interest in it or lien upon it, so far as defendant knew. The express charges on this scrip were in the account, and have not been objected to.

The plaintiff objects that it is not liable because Reynes and Villere sold 144 shares instead of 194. If this had

caused any injury to plaintiff, there would be force in the objection. But the error was a positive benefit to plaintiff. For it diminished the possible liability by $500. There was no direction to sell either the whole or none. An agent authorized to sell a house might not be justified in selling half of it. But unless special directions to the contrary were given, an agent who had shares of stock to sell might sell in parcels, or might sell a part, if he could not the whole. Or he might sell a part to one person, and the rest to another. Each sale would be valid, and within his authority. So was the sale in the present case.

The defendant did exactly what the plaintiff requested. If, in so doing, it suffered any loss, or became liable to damage, the plaintiff must indemnify. The plaintiff assumed no risk as to the power of the administrator to make a transfer. It could know nothing about that. It was for the administrator to know whether he could deliver what he proposed to sell. And it was for the plaintiff to know or to ascertain that, when it employed defendant to send the scrip to its correspondent.

The Germania Bank did just what was proper. It was in accordance with custom and good dealing to make such a sale through a broker. If the Germania Bank had neglected to take this course, and had attempted to make the sale itself, it would have been liable, if it had thereby failed to get the full value.

The sale made by Reynes and Villere to Willoz was properly made, and no fault can be charged to them. But neither Reynes and Villere, nor the Germania Bank, could deliver the stock on the next day when, by custom, it should have been delivered. For this inability to deliver they were not responsible. It is shown that, unless there be a special agreement, the stock is to be delivered the next day; and it is found that the Germania Bank made efforts to secure the transfer of the stock, but was unsuccessful.

The reason given by the company for refusing to transfer

as found, was that there was a contest between the adminis-
trator and the heirs.   The word " heirs " was probably used
in a civil law meaning.   And a good deal of argument has
been adduced to show that the title to the stock was in H.
Joseph Budington, administrator, appointed in New York, and
that the plaintiff could have compelled a transfer.   Perhaps,
however, that matter is not directly material.   The question
is, were Reynes and Villere liable to Willoz for the failure
to deliver the stock at the time it was deliverable.   Whether
the Crescent City Railroad Company rightfully or wrong-
fully refused to transfer might be important in an action
against that company.   But could their wrongful refusal
excuse the broker who sold the stock for his failure to
deliver?   Can we construe the contract of sale as an agree-
ment to deliver, unless the company wrongfully refuses to
transfer?   Would a purchaser buy, if there were such a con-
dition?

But further, the law of Louisiana was proved on the trial.
It was shown that under the circumstances above detailed
as to the action of H. Joseph Budington the assets became
vested in the court of Louisiana; that if these scrip certifi-
cates were sent from New York to Louisiana with written
authority sufficient to effect a valid sale in New York, the
sale in Louisiana could be effected only by authority of the
court of Louisiana.   It is also shown that an administrator
cannot be appointed in Louisiana without giving a bond.

Now the law thus proved to exist in Louisiana is the law
of this state.   Although personal property is subject to the
law which governs the person of the owner in respect to suc-
cessions, yet the right which an individual may claim to per-
sonal property in one country under title from a person
domiciled in another can be asserted only by the legal in-
strumentalities provided by the country where the claim is
made.   Hence an administrator appointed in one state has
not, as such, any authority beyond that state.   Parsons *v.*
Lyman, 20 N. Y. 103; Stone *v.* Scripture, 4 Lans. 186.   Now

we do not mean that the administrator appointed in New York might not have received the voluntary payment of debts in Louisiana. Nor need we say that if the Crescent City Railroad Company had voluntarily transferred this stock such transfer would not, at least according to our laws, have been good. But the doctrine is that the foreign administrator could not compel a transfer and hence the company could not be said to have acted wrongfully in refusing. This is still more evident since previous to the time in question an administrator had been appointed in Louisiana. We cannot, therefore, see why Reynes and Villere were not liable to Willoz for the damages.

The plaintiff urges that Reynes and Villere, the Germania Bank and the defendant did not give plaintiff an opportunity to compel the transfer. But Willoz was not bound to wait until the remote principal had been notified, and had carried through a litigation against the railroad company. He had his claim on Reynes and Villere, and did not need to go further or to wait.

The claim between the brokers was submitted, according to the rules binding them, to the arbitration committee. Whether their award was binding on these parties we need not decide, because the amount of the actual damages has been proved on the trial. On that arbitration Reynes and Villere took the ground that not they, but the Germania Bank, their principal, was responsible. The committee followed a rule, alleged to be of the New York Stock Exchange, to the effect that a party to a contract shall not be compelled to accept a principal other than the broker contracting, unless the name proposed be satisfactory, or be declared at the time of making the offer. This seems to be the common rule, that an agent is liable personally unless at the time he discloses his principal. At any rate, the substitution of the Germania Bank as the party against whom Willoz should make his claim would not have benefited the plaintiff. We do not see that there is any conflict as to the amount of damages

sustained.   Although probably the question of the amount of damages may not be before us, and therefore we will not pass upon it.

There is nothing, then, to show that Reynes and Villere, the Germania Bank and the defendant did not act severally in good faith, and in strict accordance with instructions received from the immediate principal of each.   So doing, each was entitled to be indemnified by the immediate principal for loss sustained in the discharge of the duties of the agency.   Howe *v.* Buffalo, N. Y. & E. R. R. Co., 37 N. Y. 297.

The plaintiff, in a letter to defendant, placed its objection to pay these damages on the ground that the Germania Bank should have found out, before offering the stock for sale, whether it could be transferred.   Nothing of that kind can be inferred from the instructions.   And the finding of the court is that the Germania Bank was not guilty of negligence.

It may also be noticed that after defendant had notified plaintiff of the facts, and plaintiff had declined to admit the charge, the defendant, in December, 1877, suggested that plaintiff should make any contest it might desire, and offered to put plaintiff in possession of any needed facts.   The plaintiff, therefore, had the opportunity of contesting the matter between defendant and the Germania Bank.   Certainly defendant was not bound to litigate.

And another fact may be noticed, that is, that H. Joseph Budington, who is the plaintiff's principal, afterwards in March, 1884, sold these 194 shares for $19,000, a large advance over the price at the time of the transaction in question.   So that he is not a loser by the refusal to transfer.

The judgment should be reversed, a new trial granted, costs to abide the event.

LANDON, J., concurs.

INGALLS, J. (dissenting).—Being unable to adopt the conclusion reached by my associates in this case, I proceed to state my reasons for dissenting therefrom.

I am convinced that the decision of the learned trial court was in accordance with the facts and the law of the case. The facts in regard to which there is any serious dispute are very few.   The action was brought by the plaintiff to recover the sum of $1,440, with interest from April 12, 1878, claimed to be due to the plaintiff from the defendant as the balance upon an account for money deposited with the latter.   A draft for such money was drawn by James E. Ostrander, the treasurer of the plaintiff, upon the defendant and payment was refused.   We do not understand but that the amount claimed would be due and owing by the defendant to the plaintiff, were it not for the counterclaim insisted upon herein by the defendant, which consists of money which the defendant claims to have paid to the Germania National Bank of New Orleans, and connected with the sale of 144 shares of the stock of the Crescent City Railroad Company, and which sale of such stock was made under substantially the following circumstances.   Henry J. Budington, who was a resident of Kingston, Ulster county, state of New York, was the owner of 194 shares of said stock at the time of his death, which occurred at the city of New Orleans, February 29, 1876.   On the 29th day of May, 1876, H. Joseph Budington, the son of the deceased, was duly appointed administrator of the goods, chattels and credits of the deceased, and as such administrator he took possession of the personal property of the deceased, including the certificates for the said 194 shares of stock.   He delivered such certificates of stock, with a power of attorney executed by him as such administrator, authorizing a transfer thereof to James E. Ostrander, who was the treasurer of the plaintiff, with instructions to Ostrander to send such certificates and power of attorney to the corresponding bank of the plaintiff in the city of New York, requesting such bank to cause the 194 shares of stock to be sold.   James E. Ostrander undertook to perform such service, and in the manner found by the trial court as follows, as appears at folio 243 of case:

" *Seventeenth.* Upon December 6, 1877, the defendant received a letter written upon plaintiff's letter-heading and signed by ' J. E. Ostrander, Treas.' " Mr. Ostrander was then the treasurer of the plaintiff.

This letter contained said certificates of 194 shares of the capital stock of the Crescent City Railroad Company of New Orleans, and also a power of attorney to transfer the stock signed by the said Budington, as administrator of Henry J. Budington, in whose name the shares stood, together with a certificate of the appointment of the said H. Joseph Budington as administrator by the surrogate of Ulster county. The letter requested that the defendant would send " all this to your correspondent in New Orleans, and order the same sold at a price not less than twenty dollars per share." The defendant received such certificates of stock, with the power of attorney, and transmitted them to the Germania National Bank of New Orleans with instructions to sell such stock. The last named bank placed the certificates in the hands of Reynes and Villere who were members of the stock exchange, directing them to sell the stock for the best price attainable, not less than twenty dollars a share. They sold 144 shares of the stock at twenty dollars a share to a person by the name of Willoz. Written memoranda of sale were exchanged, and nothing further was done at the time, and no time was fixed for the delivery of the stock. The Crescent City Railroad Co. refused to transfer the stock upon the alleged ground that there existed a contest between the administrator and the heirs of Henry J. Budington in regard to the ownership of the stock. We do not discover in the evidence any foundation for such pretence on the part of the railroad company. The Germania National Bank endeavored to persuade the railroad company to make the transfer, but took no steps to compel such transfer, nor does it appear that such bank even notified the plaintiff or the defendant of such refusal on the part of the railroad company. The transfer not having been effected, the purchaser of the

144 shares of stock claimed damages to the amount of ten dollars a share, which demand not being complied with, the matter was submitted to arbitration under what was assumed to be the regulations of the stock exchange. And there was awarded to Willoz the sum of $1,440 as his damages on account of such failure to make delivery of the stock, which sum the Germania National Bank paid, without previously notifying either the plaintiff or defendant of the arbitration, or of the award made by the arbitrators, so as to enable the parties interested to take such steps as they might deem necessary to protect their rights. The defendant herein repaid to the Germania National Bank the money which was paid by it to Willoz, without previously advising the plaintiff or Budington of its intention to make such payment. Certainly the facts disclose a course of conduct most extraordinary in regard to the attempted sale of stock. The certificates of stock were subsequently returned to the defendant, and the same were thereafter sent to the plaintiff. The trial court has found in regard to such proceedings the following:

*Fifteenth.* That no legal steps whatever were taken by either Willoz, Reynes, the Germania National Bank, or the defendant, to compel the transfer of the stock by the Crescent City Railroad Company to Willoz.

*Sixteenth.* That no opportunity was afforded the plaintiff to compel the transfer of the stock by the Crescent City Railroad Company to Willoz.

*Seventeenth.* That the Crescent City Railroad Company stated that they refused to transfer the stock because they said there was some trouble between the administrator and the heirs of Henry J. Budington, and at the time application was made to them to transfer the stock there existed a contest between the stockholders of the road with reference to securing or controlling the management of the road.

*Eighteenth.* That there was no rule of the New Orleans

Stock Exchange governing all the questions of the dispute which arose between Willoz and Reynes.

*Nineteenth.* That the matter in dispute between Willoz and Reynes was referred to the arbitration committee of the New Orleans Stock Exchange without the knowledge, consent, or privity of the plaintiff.

*Twentieth.* That the arbitration committee of the New Orleans Stock Exchange finding no rule of that exchange under which they could decide the matter in dispute between Willoz and Reynes, arbitrarily and without the knowledge, privity or consent of the plaintiff, the defendant, or the Germania National Bank, consulted the rules of other stock exchanges in other cities of the country, and claimed to have adopted a rule of the New York Stock Exchange.

*Twenty-first.* That there is no proof that there is or was any rule of the New York Stock Exchange of the character claimed to have existed by the members of the arbitration committee of the New Orleans Stock Exchange, and under which they made their award.

*Twenty-second.* That the plaintiff was not informed of the refusal by the Crescent City Railroad Company to transfer the stock until after the award of the arbitration committee of the New Orleans Stock Exchange, and the payment of the amount awarded by that committee by the Germania National Bank to Reynes.

The sale of the 144 shares of stock was, I think, a violation of the instruction contained in the letter addressed to the defendant, and which constituted the only authority to make the sale of the stock. The direction was to sell all of the shares of stock, being 194 in number, and at a price not less than twenty dollars a share, and no discretion was conferred to sell a lesser number. Thus it appears that the agency related to but one subject matter, and authorized the performance of but one act, in the manner expressly stated in the letter of instruction, which was free from uncertainty or ambiguity, and was restrictive in its character, and by its

terms, fairly construed, directed the sale of the stock in one parcel or block and at a price not less than twenty dollars per share. It is a fair presumption that the owner of the stock did not desire to sell a portion of the stock and to retain the residue, and I think such intention is inferable from the letter of instruction and the accompanying circumstances. It does not appear that any effort was made to sell the residue of the stock. This controversy is not between the plaintiff and the purchaser of the stock, but between the plaintiff and the defendant to which the instruction was given to sell the stock, and, therefore, presumably acted with a knowledge of the nature and extent of the authority conferred upon it. I am unable to accept the theory that in the absence of an express direction not to sell a lesser number than 194 shares that the agent possessed an implied authority to sell as many shares, and in such parcels as was deemed expedient, as the practical effect of such doctrines would seem to be, to allow an agent to substitute for an express direction an implied authority. Suppose an agent should be directed to sell a farm at not less than a fixed price per acre, would the agent be authorized to divide the farm and sell a portion thereof, without the knowledge or consent of the owner? I think not. And to my mind the sale of the stock in the manner it was made seems equally, if not more, objectionable.

The clear duty of the agent was to offer the entire stock, 194 shares, and if a purchaser could not be obtained for the same, that fact should have been communicated to the plaintiff, and direction obtained to sell the same in parcels, or to return the scrip. Such course seems reasonable. The agency created was special and not general, and consequently the instructions should have been strictly followed. In Paley on Agency, 3d Am. ed., p. 201, the author says: " But a special agent who is employed about one specific act, or certain specific acts, does not bind his employer, unless his authority is strictly pursued, for it is the business of the party

dealing with him to examine his authority." See, also, Skinner *v.* Dayton, 5 John. Ch. 351, 365. In Bickford *v.* Menier, 107 N. Y. 490; Ch. J. RUGER, after citing the remark of Judge COMSTOCK in the Mechanics' Bank *v.* N. Y. & N. H. R. R. Co., 13 N. Y. 632, " That underlying the whole subject there is this fundamental proposition, that a principal is bound only by the authorized acts of the agent," proceeds to enunciate the following proposition : " It would seem to be the general rule that no acts of an agent can be resorted to to establish a power not included within the terms of his commission, except those which are brought to the knowledge of his principals, and are approved or acquiesced in by them." Applying that doctrine to the facts of this case, and bearing in mind that the defendant's claim is for money which the defendant advanced to the Germania National Bank, and that the authority for such advance depended solely upon the power conferred by the letter of instruction to the defendant, which derives no enlargement or support from any reasonable presumption or implication, which in some cases, and under other circumstances, courts have indulged in favor of *bona fide* purchasers of personal property, I am unable to discover by what authority the defendant paid to the Germania National Bank for the plaintiff the said sum of $1,440 without first informing the plaintiff of its intention to make such payment, and receiving its assent thereto.

The inquiry here involves simply a question of authority, and not of expediency, and, consequently, it is immaterial whether or not through the fluctuations of the stock market, the failure to perfect the sale of the 144 shares of stock proved pecuniarily advantageous to the estate of Henry J. Budington. That estate is not represented in this action, and should not be confounded, it seems to me, in determining the rights of the parties hereto. The plaintiff in this action, not being the owner of the stock, could not be benefited by any advance in price, and consequently that

consideration cannot have even an equitable bearing in favor of defendant against the plaintiff herein. The pertinent inquiry is, whether the defendant has established a legal right to withhold from the plaintiff its money upon the pretext insisted upon. The defendant's claim must rest upon the theory of money paid for the plaintiff at its request, and the facts negative the idea of any such request, or even acquiescence by the plaintiff in such payment. It appears that the instruction to sell the stock was transmitted by the defendant to the Germania National Bank, and, therefore, both banks acted with knowledge thereof, and should have followed the instructions contained in the letter, or have asked a modification thereof, as there was abundant opportunity to do so. Furthermore, I think the view taken by the learned trial court in regard to the binding force of the arbitration proceedings, so far at least as the rights of the plaintiff and the Budington estate are concerned, was justified by the facts established, and the law applicable thereto. Neither were heard or even notified of the proceeding, and so far as the evidence seems to disclose, the method by which the damages were adjusted was without precedent, and calculated to work injustice to the owner of the stock. In effect the plaintiff was called upon to pay $1,440 without being chargeable with any wrongful act, or even a breach of duty, to satisfy the speculative demand of Willoz the purchaser of a portion of the stock awarded to him by such an extraordinary proceeding. The defendant paid the money voluntarily, with a knowledge of all the facts, and without notifying the plaintiff of its intention to make such payment, and now seeks to compel the plaintiff to reimburse it for the money advanced in direct violation of the instruction of the plaintiff and Budington. I am convinced that the decision of the trial court was correct, and that the judgment should be affirmed, with costs.

Judgment reversed and new trial granted, costs to abide event.

NOTE ON " LIABILITY OF COLLECTING BANK."

The title to commercial paper does not ordinarily vest in the correspondent of a collecting bank. Arnot *v.* Bingham, 55 Hun, 553.

The indorsement of paper for collection merely passes no title. National B. & D. Bk. *v.* Hubbell, 117 N. Y. 384; rev'g 49 Hun, 610.

The title to the collected proceeds passes to the correspondent. Id.

The general assignee of the correspondent acquires no title to the proceeds uncollected at the time of the assignment. Id.

The assignee is liable to the sender for a subsequent collection. Id.

An order of the court to pay a dividend of such collected moneys to the creditors is no protection to him. Id.

A bank, receiving from a collecting bank a check for collection, does not become a *bona fide* holder by crediting remitting bank with the amount of the proceeds on an existing indebtedness. Bank of Syracuse *v.* W. M. & F. I. C. Bk., 59 Hun, 620.

As to acts of the correspondent, which estop it from asserting, as against its principal, the legal rights or equities of a third person, see Crn Ex. Bk. *v.* F. N. Bk., 118 N. Y. 443.

The payment of a collecting agent to the principal, before the fraud in a check is discovered, relieves him from liability. Nat. C. Bk. *v.* Westcott, 118 N. Y. 468.

An endorsement for collection renders a check non-negotiable. Id.

A collecting agent, by an endorsement, does not warrant the genuineness of the check. Id.

In order to absolve a collecting agent, who received money on a raised draft, he must actually pay over the proceeds to his principal. U. S. Nat. Bk. *v.* Nat. P. Bk., 59 Hun, 495.

The drawers, on forwarding a draft to an insolvent bank for collection, may reclaim it or its proceeds, upon discovery, from any one but a *bona fide* holder. I. & T. Nat. Bk. *v.* Peters, 123 N. Y. 272; affirming 51 Hun, 640.

The bank becomes a trustee of the drawer as to such proceeds. Id.

The proceeds of a note sent to a bank for collection cannot be recovered from a receiver, unless it be shown that they came into his hands. Frank *v.* Bingham, 58 Hun, 580.

A bank, which has received from its correspondent a raised draft for collection, is not liable to repay the proceeds after remitting to its principal before notice. National Park Bk. *v.* Seaboard Bk., 114 N. Y. 28.

The entry of the amount in its books upon the receipt of the draft, to the credit of the correspondent, does not vest the title. Id.

But upon the payment to the correspondent of an amount exceeding the collection and the balance then due, it will be deemed to have remitted the proceeds of the draft. Id.

A collecting bank, in the absence of specific instruction, where it acts in accordance with the usage of banks in its vicinity, cannot be charged with liability. Crouse v. First Nat. Bank, 61 Hun, 618. It was so held where a bank to which a draft was sent for collection, mailed a notice according to its custom to the drawee, who lived at a distance, and some days after received an acceptance with an agreement by the drawee to pay, instead of doing which he made an assignment. Id.

In this state, a bank receiving commercial paper for collection, in the absence of a special agreement, is liable for a loss occasioned by the default of its correspondents or other agents employed by it to effect the collections, whether they are in its own banking house or at some distant place. St Nicholas Bank v. State Nat. Bank, 128 N. Y. 26.

The transmitter for collection, where notes and checks, sent to a bank for collection, had been collected before the bank failed and the drafts which it had sent in return for the notes and checks were dishonored, can have no preference in the suit against the receiver of the bank, Frank v. Bingham, 58 Hun, 580; if the proceeds of the remittance has been mingled with the general funds of the bank. Id.

See further, Naser v. First Nat. Bank, 116 N. Y. 492 ; Indig v. City Bank, 80 Id. 100 ; Briggs v. Central Bank, 89 Id. 182 ; Bank of Meadville v. Fourth Nat. Bank, 24 Hun, 241; 89 N. Y. 412.